## Topelski *v.* Universal South Side Autos, Inc., Appellant.

340

Argued March 14, 1962.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN and EAGEN, JJ.

*Frederick N. Egler,* with him *Reed and Egler,* for
defendant, appellant.

*John R. Bredin,* with him *Pringle, Bredin & Martin,*
for defendant, appellant.

*William Claney Smith,* with him *Lisle A. Zehner,* and *Smith & Zehner,* and *Maurice Louik,* Solicitor, for Allegheny County, additional defendant, appellant.

*T. Robert Brennan,* with him *Brennan and Brennan,* for plaintiff, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 24, 1962:

On September 1, 1957 at about 2:30 p.m. Frank J. Topelski (Topelski), a police officer of Allegheny County (County) on a county-owned motorcycle in the line of duty, was escorting three automobiles containing as passengers "Lone Ranger", "Tonto" and other television entertainers in an easterly direction along East Carson Street, Pittsburgh. At the intersection of East Carson and South 18th Streets, the motorcycle operated by Topelski and a 1953 Mercury automobile owned by Francis J. Crane, Jr. (Crane) and being operated by him in a northerly direction on South 18th Street collided.

On December 27, 1957, Topelski instituted a trespass action for damages arising from the accident against Crane and Universal South Side Autos, Inc. (Universal) in the Court of Common Pleas of Allegheny County. Crane then joined as an additional defendant the County alleging that the County was either solely or jointly liable by reason of its negligent acts as Topelski's employer. The County filed an answer and counterclaim in the latter of which it asked recovery for salary, medical and hospital expenses paid to or for Topelski. The case was tried before Judge HOMER S. BROWN and a jury. The jury found Crane, Universal and the County guilty of negligence and awarded a verdict in favor of Topelski in the amount of $50,000 against all three defendants and the verdict as moulded found in favor of Crane and Universal

against the County on the County's counterclaim. Universal and Crane moved for judgment n.o.v. and the County moved for judgment n.o.v. and a new trial. All these motions were refused and judgments entered on the verdict. Crane (Appeal No. 140) and Universal (Appeal No. 91) appealed from the refusal of judgment n.o.v. only. The County (Appeal No. 145) has appealed from the refusal of judgment n.o.v. and the refusal of a new trial.

In Crane's appeal, his *sole* contention is that Topelski was contributorily negligent as a matter of law. In Universal's appeal, the contention is that, in addition to Topelski being guilty of contributory negligence as a matter of law, Topelski had failed to prove any negligent conduct on Universal's part which was the proximate cause of the accident. In the County's appeal, the County contends that it is entitled to a judgment n.o.v. because the evidence was not sufficient to sustain the verdict against it or, in the alternative, it is entitled to a new trial because the court below erred in moulding the verdict and in failing to recognize the County's subrogation rights for payments made to or for Topelski.

## Contributory Negligence of Topelski

Topelski testified that, as he proceeded on his motorcycle eastwardly on Carson Street, he stopped at the intersection of Carson and 18th Streets and, at that time, the traffic light was green for traffic proceeding on Carson Street. He stated: "Before I entered the intersection I looked to my left, that would be down 18th Street, and then I looked to my right, and I saw one car coming down 18th Street" in a northerly direction; Topelski raised his hand to the oncoming car to stop and that car did stop; Topelski looked to the left again and saw nothing, looked in his rearview mirror to see

where his convoy was and continued at approximately five miles per hour; he then stated: "I looked to the right as I kept moving down the intersection" and stated that, as he "paused at the intersection", he "looked to his right". Under this testimony, Topelski, with a green light in his favor, did look both to his right and left before proceeding into the intersection; there was no traffic approaching from the left and the automobile which he did see approaching from his right stopped in obedience either to his signal or to the red light against traffic proceeding on 18th Street. Furthermore, Topelski blew his siren, proof of which is upon this record. The Crane automobile came from behind the stopped automobile on South 18th Street, passed the stopped automobile and proceeded into the intersection where it collided with Topelski's motorcycle.

In *Enfield v. Stout*, 400 Pa. 6, 161 A. 2d 22, we recently stated "Declaring an individual guilty of contributory negligence as a matter of law should be done only where the conclusion is inescapable: [citing a case]". (p. 12). Our review of this record indicates that the circumstances are such that contributory negligence *could not* be declared as a matter of law. As Topelski approached this intersection, according to his testimony, the traffic signal was green and he had the right to assume that this traffic signal, red as to 18th Street, would be obeyed by traffic on that street: *Zurcher v. Pittsburgh Railways Co.*, 353 Pa. 212, 44 A. 2d 581; *Koehler v. Schwartz*, 382 Pa. 352, 115 A. 2d 155. Topelski, however, did not place full and complete reliance on the traffic signal because, *at the intersection*, he looked in both directions before proceeding into the intersection. To his right he saw one automobile approaching in a northerly direction and, before he proceeded, he made sure that that car had stopped and he rightfully assumed that all following traffic would

likewise stop. He then looked to his left and, as was his duty, looked to his rear to check the convoy which he was under a duty to escort. He had no reason to anticipate that a car would swoop out from the rear of the stopped automobile on 18th Street, swing around that vehicle and enter the intersection to which he was committed at the time. The language of Justice (later Chief Justice) MAXEY in *Graff v. Scott Bros., Inc.*, 315 Pa. 262, 172 A. 2d 659, is particularly apposite: "He not only looked ahead but he looked *to the right,* where he saw the halted cars. He was under no obligation to look far down the street to ascertain whether or not some motorist was coming at a reckless rate of speed which would carry him across the intersection in defiance of the red traffic signal. Furthermore, in his calculations, he had the right to assume traffic from his right would stand still until it was given the green signal. . . ." (pp. 266, 267) In our view, the question of contributory negligence was solely for the jury and judgment n.o.v. could not be entered on the ground that Topelski was contributorily negligent as a matter of law. Since this is the *only* ground of Crane's appeal, that appeal cannot be sustained.

Evidence of Negligence on Universal's Part which was the Proximate Cause of the Accident

Two days prior to this accident, Universal sold to Crane the 1953 Mercury automobile which at that time was on a used car lot over which was a large sign reading "Guaranteed" which Universal's president stated referred to the cars on the lot. On August 1, 1957—one month *before* the accident—Universal's record indicated that car's mileage at 48,860 miles. Twenty days *after* the accident the car's mileage was 48,947 miles indicating the car had been driven only 87 miles in 26 days. How much of this driving took place *after* the

sale to Crane and until the date of accident is not shown.

Approximately an hour and fifteen minutes after the accident, Crane gave a written question and answer statement to Captain Morphy, then duty officer for the Pittsburgh City police department in which the following appeared: "Q. What was the condition of your brakes? A. Well, I went to pull the emergency brake and there was no brake there. I held my foot on the foot brake and I pushed the foot brake to the floor but it would not hold."

When Captain Morphy was examined by the County's counsel as to oral statements made by Crane, he gave the following testimony: "Q. What were those statements? A. I asked him the reason for hitting the officer. Q. What was his response? A. He stated that he could not stop. Q. Did he tell you why he could not stop? A. Yes, he did. Q. Why could he not stop? A. He said that he went to pull on the emergency brake and there was none, and he pressed on the foot brake and it went clear to the floor. . . . Q. Did Mr. Crane make any other comments about this accident to you, Mr. Morphy? A. Yes, he did. I asked him for the reason he did not stop before he hit the officer. Q. What was that reason? A. He stated he applied the brakes and the car would not stop. He said after he hit the officer, his car went out of control. The brakes were applied before he hit the officer, and he definitely stated that to me."

*After* the accident Crane's automobile was taken to the City Pound where it remained from September 1 to September 5, 1959 when it was taken to Universal's garage where it was examined on September 20, 1959 by Leo Geis, an expert mechanic, in the presence of one Davis, a county police officer. Geis testified: "A. I jacked the car up, got underneath it, checked all the cables, the rods, and I could see that they weren't

touched. They were all rusted and full of—you couldn't even see the nuts on them. So that was an indication that nobody had touched them. Q. What was their condition? A. There just weren't any brake." Geis further stated that the brake lining on the front wheels was new and the brakes were in good condition but the emergency brake did not engage at all and the cables were loose. There was too much free pedal travel between the master cylinder and the foot brake. On removing the front wheels he found: "The eccentric bolts on the brake were not properly adjusted. By that, the shoe was wore on the bottom of the shoe, where it should have been wore ever around. I would say it was improperly adjusted."

The court below fully answered Universal's contention that there was no evidence of its negligence as the proximate cause of the accident.

". . . [Crane], in a written statement one hour after the accident, . . . asserted that at the time of the accident he applied his emergency brake and 'there was no brake there'. He then put his foot on the brake pedal and he 'pushed the foot brake to the floor but it would not hold.' These statements are direct evidence that the brakes failed. [Crane] did not need to be an expert to attest to the facts that the brakes failed, for such is a matter which can be understood by any person without special knowledge, training or skill. Delair v. McAdoo, 324 Pa. 392, 397.

"Objection was made by [Universal] to the admission of certain testimony concerning the inspection of the condition of the brakes approximately twenty days after the accident. The evidence has been objected to as too remote. The mere passage of time, unless considerably greater than twenty days, cannot change the condition of the brakes. The greater the passage of time, however, the greater the opportunity there is to deal unfairly with the evidence, and cause the evidence

to reflect a condition that did not actually exist at the time of the accident. This could also be accomplished in a few minutes. Whenever the condition of a thing is in question, evidence of its condition at a prior or subsequent time is admissible if accompanied by proof that its condition has not changed in the meantime. [citing a case]. Where a car is not used between the time of an accident and the time of its inspection about a month later, and it was under lock and key in the meantime, it is not error to admit testimony as to the condition of the brakes at the time of the examination, in the absence of evidence that the car was used. [citing a case]. In the case before us, there was evidence to the effect that the car was towed from the scene of the accident to the City Pound immediately following the accident; that the automobile remained in the City Pound for the five days succeeding the accident; and in the possession of [Universal] the remaining period before the inspection took place. There was no testimony to the effect that the automobile had been used after the accident. There was evidence to the effect that the automobile was not in condition to be used before the inspection. Thus, the only element of remoteness proved was the mere passage of time. The testimony provided evidence from which the jury might infer that the condition of the vehicle had not changed, through use or otherwise, during the twenty days.

"[Universal] further contend[s] in [its] motion that there was no competent evidence that the condition of the brakes was the proximate cause of the accident. [Universal] state[s] that since there was evidence to the effect that . . . [Crane] entered the intersection at 35 miles per hour, and since at that speed [Crane] could not have stopped before colliding with the officer, even assuming that [Crane] had adequate brakes, the failure to have adequate brakes could not have been the proximate cause of the accident. Where

facts are admitted, or reasonably inferable from the evidence, it is for the Court to determine whether the actor's conduct is a substantial factor in bringing about the harm to another. Allega v. Motor Express Co., 378 Pa. 1, 5. But where facts are disputed, or where from the undisputed facts there is room for reasonable difference of opinion as to whether the defendant's act was the, or a proximate cause of the injury, the matter is for the jury to decide. Helmick v. South Union Township, 323 Pa. 433; Restatement, Torts, §453. The speed at which [Crane] entered the intersection, and how far [Crane] was in the intersection when he struck the officer, his reactions at the time of the accident— these are matters in dispute. It is therefore for the jury to determine whose negligence was the proximate cause of the injury sustained."

In *Trusty v. Patterson*, 299 Pa. 469, 149 Atl. 717, the defendant, a garageman, rented a car with defective brakes to a bailee, who, after reporting to defendant that the brakes were defective, continued to use the car and ran into the plaintiff. We held, in affirming a judgment on a verdict for the plaintiff, that the jury could properly find, as it did, that defendant was negligent and that the defective brakes, rather than the speed of the car, was a proximate cause of the plaintiff's injuries. The *Trusty* case and the Restatement, Torts, §447 clearly support the ruling of the court below.

Universal's contention is without merit and its appeal cannot be sustained.

### Was there any Evidence of Negligence on the part of the County?

The theory upon which Crane sought to hold the County liable was that a servant and agent of the County who was Topelski's superior had instructed Topelski

in the performance of his escort duties, had specifically instructed him to disregard red traffic signals as in the case of an emergency, that Topelski had followed these instructions and that his compliance with these instructions was the proximate cause of the accident. It is not contended that in following these instructions Topelski was guilty of contributory negligence.[1]

The real crux of our inquiry is whether any superior of Topelski, acting as an agent for the County, did so instruct Topelski. The court below found such instructions in the testimony of Sergeant Carr of the County Police. Sergeant Carr, Topelski's superior officer, told Topelski to go to the Carlton House, meet officer Bertges and whoever was in charge of the detail and take the "Lone Ranger" and the other persons on a hospital tour. On cross-examination by Topelski's counsel, Carr testified: "Q. Did you give them [officers in the detail] any instructions if they came to a red light at an intersection? A. Well now, we have been on a lot of escorts. If we hit a red light and it was an emergency, we would proceed with caution and give a signal. . . . Q. Even though you have a red light you proceed with caution. A. You should proceed with

---

[1] In *Williams v. Clark*, 204 Pa. 416, 418, 54 A. 315 this Court stated: " '. . . The true rule in this as in all other cases is, that if the master gives the servant to understand that he does not consider the risk one which a prudent person should refuse to undertake, the servant has a right to rely upon his master's judgment, unless his own is so clearly opposed thereto that, in fact, he does not rely upon his master's opinion. A servant is not called upon to set up his own unaided judgment against that of his superiors', and he may rely upon their advice and still more upon their orders, notwithstanding many misgivings of his own. The servant's dependent and inferior position is to be taken into consideration; and if the master gives him positive orders to go on with the work, under perilous circumstances, the servant may recover for an injury thus incurred, if the work was not inevitably and imminently dangerous.' "

caution if you went through it. . . . Q. Do you make any distinction between an emergency and an escort? A. Well he was protecting this man, anyone. There could be a riot, there could be anything there. By the Court: Q. Answer the question yes or no, and then make an explanation. Do you make any distinction between an escort and an emergency? A. Well, I'd say that was an emergency. Q. Then your answer is 'No'? A. Right." Later Carr stated "Well now, if you are escorting someone, protecting them, if you hit a red light, you would give some sign and go through it. You have to protect this man."

We fail to find anything in this testimony which indicates that Carr, as the superior officer, *instructed* Topelski on *this* escort detail to disregard red lights or any traffic signals. All that Carr's testimony amounts to is an expression of opinion, strictly his own, that he saw no distinction between an emergency and an escort detail so far as red traffic signals were concerned. On the other hand, Topelski's testimony was that, outside of being told where to report, he was given no instructions as to this escort duty and Officer Bertges who was on this detail directly testified that on escort convoys, not an emergency, the police are told not to go through red traffic signals. Furthermore, Topelski testified that he stopped at a red light at Forbes and Sixth Streets and did not go through a red traffic signal at Carson and 18th Streets.

In the light of this record there is no evidence upon which to pinion the County with liability for this accident. In submitting to the jury the question of the liability of the County the court below fell in error and judgment n.o.v. should be entered in favor of the County and against Topelski, Crane and Universal.

### Is the County entitled to a New Trial on its Counterclaim?

When the jury returned its verdict the verdict stated: "We, the jury, find [Universal] . . . and [Crane] defendants, and [the County], Additional Defendant, Guilty of Negligence, and furthermore we, the jury, award [Topelski] the sum of $50,000." The court below then moulded the verdict to read: "A verdict in favor of [Topelski] in the sum of $50,000 against Universal and [Crane], defendants, and [the County] additional defendant; and in the counterclaim, a verdict in favor of [Universal] and [Crane] against [the County]."

By reason of the provisions of the Second Class County Code,[2] the County became obligated to pay Topelski, its police officer, injured through the performance of his duties, his full rate of salary (until his disability ceased), together with all medical and hospital bills incurred in connection with his injuries. In accordance therewith, the County in the case at bar has paid in full Topelski's salary and all his medical and hospital bills.

There can be no question of the *right* of the County to recover by way of subrogation from the third party tortfeasor all the salary, medical and hospital expenses paid to or for Topelski:[3] *Philadelphia v. P. R. T.*, 337 Pa. 1, 10 A. 2d 434; *Potoczny v. Vallejo*, 170 Pa. Superior Ct. 377, 380, 85 A. 2d 675; *Furia v. Philadelphia*, 180 Pa. Superior Ct. 50, 118 A. 2d 236.

The real question is *how* must the County proceed to enforce its right of subrogation and was the method

---

[2] Act of July 28, 1953, P. L. 723, §1525, 16 PS §4525.

[3] "Pennsylvania is the only jurisdiction where it has been held that a city [County] was entitled to such right of subrogation under equitable principles and in the absence of a statute conferring such right.": 70 A.L.R. 2d 476, 477.

adopted in the case at bar a proper method. The County could have instituted an action in the name of Topelski individually and in the name of the County use-plaintiff against Crane and Universal (*Meehan v. Philadelphia,* 184 Pa. Superior Ct. 659, 661, 136 A. 2d 178) or when Topelski instituted his action against Crane and Universal the County could have intervened to protect its subrogation rights (*Philadelphia v. P. R. T.,* supra, p. 4; *Potoczny v. Vallejo,* supra). Instead, the County sought to enforce its right to subrogation by a counterclaim filed against Crane when Crane brought the County upon the record as an additional defendant.

When the matter came for trial, the County, seeking to prove its counterclaim, produced testimony that it had paid up to that time hospital and medical bills of Topelski totalling $6,082.31. This testimony was later stricken from the record on the objection of Topelski's counsel; such action of the court was entirely proper. In *Philadelphia v. P. R. T.,* supra (p. 4), this Court stated: "The sums here paid by the city to the firemen were not strictly speaking wages. They were in the nature of disability compensation, similar to workmen's compensation payments and payments under an accident insurance policy and should be treated in the same manner. Such payments have always been disregarded in determining the amount of damages to which an injured plaintiff is entitled: [citing cases]." The admission of such evidence would have been prejudicial to the claim of Topelski: *Blatt v. Davis Construction Co.,* 184 Pa. Superior Ct. 30, 133 A. 2d 576. Even though he had not paid these bills, Topelski could have offered them in evidence and recovered the amount thereof: *Philadelphia v. P. R. T.,* supra, p. 4.

At the time of closing arguments, counsel for the County was permitted to discuss before the jury the County's right to subrogation. This was done without objection by other counsel motivated no doubt by a de-

sire to eliminate the possibility of any error in this respect. We believe such argument should not have been permitted under the circumstances.

In *Penna. Co. for Ins. On Lives, etc. v. Lynch,* 308 Pa. 23, 162 A. 157, we stated (p. 26): "A counterclaim is 'in effect a declaration by defendant against plaintiff in the nature of an *independent action* deferred until the defendant is brought into court': 23 Standard Enc. of Proc., page 582." (Emphasis supplied) Whether a counterclaim is filed by an original defendant against the plaintiff or by an additional defendant against an original defendant is immaterial; each such counterclaim constitutes an *independent action* against the party against whom the subrogation rights are sought to be enforced. In the case at bar, the County sought to enforce its subrogation rights against Crane, one of the alleged tortfeasors, and the procedure it adopted was improper. "Under our practice the right of subrogation can only be enforced in the original action and not in a separate suit in the name of the city:" *Philadelphia v. P. R. T.,* supra, p. 4; *Potoczny,* supra, p. 380; *Furia,* supra, p. 54. In proceeding by counterclaim, the County was clearly in error. In view of such conclusion, we need not consider the propriety of the moulding the verdict by the court nor whether the County is entitled to a new trial on the counterclaim.

In *Potoczny,* supra, p. 380, 381, Judge (later Justice) ARNOLD stated: "The doctrine of subrogation is based 'on considerations of equity and good conscience . . . to promote justice . . . [and] is granted as a means of placing the ultimate burden of the debt upon the person who should bear it.' . . . 'It is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it.' "

Under the instant circumstances, the County has a *clear right* to recover by way of subrogation all the

salary paid to and all the medical and hospital expenses paid for Topelski. By relieving the County of the charge of negligent conduct on its part we have removed the only bar to such right of recovery. The inherent difficulty in the instant situation is that the County adopted an improper and inappropriate procedure to enforce its subrogation rights. It would, indeed, be odd if the County must be denied that which in equity and good conscience it is entitled to simply because it adopted an inappropriate method of enforcing its rights. The equitable consideration which gives rise in the first instance to a recognition of the existence of the *right* to subrogation dictate that the County be given an opportunity to enforce such right by an appropriate procedure. To that end the court below is directed to entertain a petition on the part of the County to intervene nunc pro tunc in the principal action instituted by Topelski against Crane and Universal.

Judgments against Crane and Universal affirmed. Judgment against the County reversed and a judgment n.o.v. entered in favor of the County.

Mr. Justice O'BRIEN took no part in the consideration or decision of this case.

---

CONCURRING AND DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the majority opinion insofar as the judgment against Crane is affirmed, the judgment against the County is reversed and judgment n.o.v. is entered in favor of the County. However, I would reverse the judgment against Universal South Side Autos, Inc., and here enter judgment non obstante veredicto in its favor.

In *Bohner v. Eastern Express, Inc.*, 405 Pa. 463, 175 A. 2d 864, we said (page 470): "While ' "[O]rdinarily the question whether the negligence of a defend-

ant is a proximate cause of the accident is for the fact-finding tribunal . . ., where . . . the remoteness of the causal connection between defendants' negligence and plaintiff's injury clearly appears from the evidence, the question becomes one of law [for the Court] :" ' Kaplan v. Kaplan, 404 Pa., supra; Listino v. Union Paving Co., 386 Pa., supra."

It is clear from the uncontradicted testimony of defendant Crane,—who drove the car which had the alleged defective brakes and caused the injury and who more than anyone else should have known what went on during those few fateful moments when plaintiff suffered his injuries—that defective brakes were not the proximate, efficient and procuring cause of the accident. In this respect Crane testified: "Q. Your automobile was moving at that time? A. Yes, sir. Q. How fast? A. I'd say about approximately 15, 20 miles per hour. Q. What did you do then? A. When the light changed, I started through the intersection. Q. Did you alter your speed? Did you give it any more gas? A. I might have gassed it up a little more. I couldn't be honest with you, sir. Q. Had you applied your brake for that intersection? A. When I started through the intersection, no, sir. Q. When had you last applied your brake before you arrived, or rather, before this accident happened when had you last applied your brake? A. At the light for Sarah Street. Q. Which brake was that? A. Foot brake. Q. Did it function? Did it start retarding the car? A. It stopped the car, yes. . . . Q. Where was this motorcycle with the policeman on it when you first saw it? A. When I first seen him make contact with me. That's when the accident happened. I mean when I hit the motorcycle, I seen the poor man flying through the air. Q. Did you see it before you struck it? A. No, sir, I didn't. . . . Q. When you first saw the motorcycle, what did you do? A. When I first saw him, when I made contact

with him was the first I saw him. So I reached for my emergency and tried with my foot. The foot brake didn't hold, didn't seem to hold, and I lost control of the car and ran into the pole."

This testimony clearly proves that (1) Crane's brakes were able to stop the car one block before, and (2) Crane did not see plaintiff until he struck him. From this it follows that the condition of the brakes at the time of the accident, even assuming arguendo that they were not in perfect condition, had absolutely nothing to do with causing the accident.