Wilfred G. BERON

v.

KRAMER–TRENTON COMPANY et al.

Civ. A. No. 72–1196.

United States District Court,
E. D. Pennsylvania.

Oct. 24, 1975.

Marvin W. Factor, Philadelphia, Pa., for plaintiff.

Edward J. Marcantonio, Walter J. Timby, Jr., Richard A. Kraemer, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This matter is before us on plaintiff's post-trial motions for judgment n. o. v. or, alternately, for a new trial, pursuant to Fed.R.Civ.P. 50(b) and 59. The case arose from injuries sustained by plaintiff, Wilfred Beron, in a fall from a forklift he was operating in the course of his employment with third-party defendant Victory Metal Manufacturing Co. (Victory). These motions pose serious questions about the present state of Pennsylvania products liability law, questions that arise as a consequence of the recent decision of the Pennsylvania Supreme Court in *Berkebile v. Brantley Helicopter Corp.*, Pa., 337 A.2d 893 (1975). *Berkebile,* purporting to "clarify the concepts of strict liability under Pennsylvania law," 337 A.2d at 897, threatens instead to disrupt the orderly administration of justice in this litigation-prone area of the law so long as these important questions remain unanswered. Inasmuch as we have been alerted to no other courts, state or federal, which have offered a written opinion interpreting *Berkebile* the task has fallen to us. For these compelling reasons we have considered plaintiff's motions with the utmost care, and we conclude that the motions must be denied.

### I.

In deciding plaintiff's motions for judgment n. o. v. or for a new trial we consider the facts and all the reasonable inferences therefrom in a light most favorable to the defendant, for whom the jury in this case returned a verdict. *Dantzler v. Defender Shipping Co.,* 285 F.Supp. 541 (E.D.Pa.1968), aff'd per curiam, 411 F.2d 792 (3d Cir., 1969). Mindful of this standard of review, we find that plaintiff Beron was an experienced forklift operator in the employ of Victory, a manufacturer of industrial refrigeration units. On August 12, 1970 Beron was assigned the task of rearranging the warehouse where Victory stored its inventory of refrigerator coils, packed in boxes and mounted on skids, and Beron was required to use a forklift to do such work.

The forklift, a machine customarily used to facilitate industrial lifting and stacking, was manufactured by defendant Eaton, Yale & Towne Manufacturing Co. (Eaton Yale). In response to Victory's inquiry Eaton Yale submitted its specifications for the model in question. Included in the specifications was the price of the lift, with several "options" which Victory could elect to delete with a corresponding reduction in the purchase price. Among the options were an "overhead canopy guard," which would shield the driver from falling objects, and a "load backrest extension," a 48 inch extension of the driver's backrest which would provide support for oversized loads that extended over the driver's head. Victory declined these two options, which would have cost a total of $160, despite the suggestion, inscribed on a warning plate that was affixed to the machine and printed in an Eaton Yale brochure, that the forklift might be hazardous without them.

Victory's refrigerator coils, weighing 250 to 300 pounds each were delivered in cartons placed on wooden skids provided by the manufacturer of the coils, Kramer-Trenton Co. (Kramer). The coils that Kramer supplied were packed one coil to a box, two boxes to a skid. The boxes,

in turn, were fastened to the skid by three metal bands. Kramer had purchased its skids from the Mt. Airy Lumber Corp.

On August 12, 1970, Beron spent the afternoon moving refrigerator coils with the Eaton Yale forklift. After several hours of uneventful work Beron placed a skid with two boxes stacked one upon the other on the prongs of the forklift, as he had done all afternoon. Noticing nothing particularly unusual about this skid and following usual procedures, he properly tilted the load back slightly and elevated the load to a position above the level of his head.[1] As he was preparing to stack the boxes at this height, he heard something cracking, glanced up and saw the boxes sliding backwards towards him. Plaintiff stood up from his seat and attempted to leap from the forklift. As he did so the seat sprang up behind him, automatically turning the motor off. Hinged as it was at the bottom front of the seat, the backrest portion of the seat pinned Beron's legs momentarily between the steering wheel and the seat itself. Further complicating his hasty exit was the difficulty plaintiff had in extricating his right foot from the smaller footwell on that side of the forklift.

As he leaped from the left side of the machine, Beron found his right foot trapped between the steering wheel and the seat. Consequently plaintiff fell to the ground in an awkward fashion sustaining a leg fracture and other less severe physical injuries. Neither of the falling boxes struck Beron.

Invoking federal diversity jurisdiction, 28 U.S.C. § 1332, Beron filed suit against Eaton Yale and Kramer in this court in 1972.[2] Following a full and fair trial on the issue of Eaton Yale's liability, the case was submitted to the jury on plaintiff's theory that Eaton Yale was strictly liable as the seller of the forklift for the injuries sustained by Beron. Grounding his case against Eaton Yale upon Section 402A of the Restatement of Torts, Second, plaintiff maintained that the forklift contained unreasonably dangerous design defects in that it was not equipped with an overhead canopy guard or a load backrest extension as standard equipment to protect the driver from falling objects.[3] In the absence of these safety features, plaintiff sought to convince the jury that the forklift was sold "in a defective condition unreasonably dangerous to the user" because the driver's area was designed in such a manner that

---

1. Plaintiff testified that he noticed that the boxes on this skid were unbanded, but that he had proceeded to move them onto the forklift in any event. These circumstances might give rise to an assumption of the risk defense, though we intimate no view on the matter. The jury, of course, did not reach this question since it found no unreasonably dangerous defect in the first instance.

2. There were several third party complaints and cross-claims most of which were not submitted to the jury and thus are not pertinent to our disposition of this motion. Eaton Yale filed a third party complaint on a negligence theory against Victory for contribution and indemnity; they also cross-claimed against Kramer. Kramer likewise cross-claimed against Eaton Yale and filed a third party complaint against Victory. Both Kramer and Eaton Yale filed third party complaints against Mt. Airy Lumber, who in turn filed a cross-claim against Victory. Aside from Beron's main claim against Eaton, only Eaton's third party complaint against Victory for indemnity or contribution reached the jury. Since Victory's liability was en-

tirely contingent on a finding of Eaton Yale's liability, that claim is of no consequence either.

3. § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

the operator could not quickly jump from the apparatus to avoid falling objects.

██ Faithfully adhering to the then prevailing law of Pennsylvania, we submitted the case to the jury under careful instructions that closely parallelled the language of § 402A.[4] Accompanying our instructions to the jury was a set of written special interrogatories which the jury answered during their deliberations. The first interrogatory, which had to be resolved in the affirmative as a prerequisite to finding Eaton Yale liable, asked the jury to determine whether "the forklift truck involved in the accident was in a defective condition unreasonably dangerous to the user." The jury returned a verdict for the defendant, specifically answering the first special interrogatory in the negative.[5] Accordingly we entered judgment for defendant Eaton Yale.

██ Plaintiff duly filed these motions for judgment n. o. v. or for a new trial, contending that both the jury verdict and the instructions were contrary to the evidence and the law. At the outset we deny plaintiff's motion for judgment n. o. v. A judgment n. o. v. is appropriate only in those circumstances where, without weighing the credibility of witnesses, it appears that the evidence admits of only one conclusion. There was ample evidence in this case from which a jury could have concluded that the forklift was not in a defective condition unreasonably dangerous to the user. In respect to plaintiff's motion for a new trial, the only tenable basis for

---

4. The jury was instructed, *inter alia*:

"to hold defendant Eaton Yale liable, you must find that the forklift truck was sold in a defective condition. This rule applies only where the product is, at the time it leaves the seller's hands, in a defective condition unreasonably dangerous to the ultimate user.

"You must determine whether the forklift truck was unreasonably dangerous for the purpose and for the use for which it was intended . . .

. . . . . . .

"A manufacturer is not required to produce a product that is accident-proof or incapable of doing harm. Almost every physical object can be potentially dangerous in a sense. Therefore, the law does not require the defendant, Eaton Yale, to make a forklift truck which is accident-proof or foolproof.

" . . . to hold defendant Eaton Yale liable, you must find that the defective condition rendered the forklift truck unreasonably dangerous to the user. This rule applies only where the defective condition makes it unreasonably dangerous because many products cannot possibly be made safe. For plaintiff to recover, you must find that the forklift truck was dangerous to an extent beyond that which would be contemplated by the ordinary user.

"Plaintiff is not required to prove that defendant Eaton Yale was negligent or careless in any way and defendant Eaton Yale can be liable to plaintiff even though it exercised all possible care under the circumstances."

5. Following the return of the verdict, one of the jurors, expressing the unanimous view of his colleagues, offered an unsolicited comment to Eaton Yale. The following dialogue transpired:

Juror No. 5: "[W]e feel that possibly Eaton, Yale and Towne should go beyond any existing regulations and make as standard equipment the overhead guard and the backrest without option, but because of Your Honor's charge to the jury and the statement of law we hold with our conclusion."

The Court: "In other words, the jury has followed by instructions and accepted the law as I gave it to you in my charge and applied that law to the facts as you found them and you answered the interrogatories in the manner in which you answered them; is that what you are telling me?"

Juror No. 5: "Yes, Your Honor."

Plaintiff argues, in effect, that this comment bespeaks confusion on the part of the jury, that the verdict and the special interrogatory answer are simply irreconcilable with the comment, and that a new trial is therefore mandated. We do not understand the jury to be expressing any confusion at all. Indeed, the jury seems to be saying that the absence of an overhead canopy and backrest extension is a mere defect, one which is not unreasonably dangerous to the user. In any event, the jury confirmed that it had applied the facts as they found them to the law as we stated it, deciding that the forklift was not in a defective condition unreasonably dangerous to the user. That is precisely what the law asks of the jury. Moreover, a court may not inquire into the purely internal workings of the jury's decisional processes on the mere suspicion of confusion. *Domeracki v. Humble Oil & Refining Co.*, 443 F.2d 1245 (3d Cir. 1971).

granting it lies in plaintiff's contention that our instruction was contrary to the law. The decision of the Pennsylvania Supreme Court in *Berkebile v. Brantley Helicopter Corp.*, Pa., 337 A.2d 893 (1975) breathed new life into plaintiff's otherwise unavailing argument that our instructions were erroneous insofar as we included the unreasonably dangerous language of § 402A.[6]

## II.

The question presented is whether the *Berkebile* opinion renders that portion of our instruction to the jury relating to "defective condition" erroneous. At the outset we note that, if *Berkebile* indeed suggests that such an instruction is improper under Pennsylvania law, we are obliged to apply the changed law retroactively in this case and grant plaintiff's motion for a new trial. "[U]ntil such time as a case is no longer *sub judice*, the duty rests upon the federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court." *Vandenbark v. Owens-Illinois*, 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941).[7] Inasmuch as plaintiff's motions were taken under advisement and decision was still pending in May, 1975, when *Berkebile* was decided, we must apply any change *Berkebile* works in Pennsylvania law.

The Opinion of the Court in *Berkebile* is an ambitious one, striving, as it does, to clarify or restate several crucial principles of strict liability in tort.[8] Our focus here is a narrow one, however. We are concerned only with that portion of the *Berkebile* opinion which discusses "unreasonably dangerous" and "defective condition." The opinion begins with the perceived premise of § 402A, liability without fault, and it observes that there are only two elements of requisite proof for the plaintiff—defective condition and proximate cause—propositions that few would quarrel with. Since § 402A imposes liability without fault, the fault notions of negligence, the Court observed, are alien to the subject. Echoing sentiments expressed by the California Supreme Court in *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972),[9] the opinion suggests that the phrase "unreasonably dangerous" evokes the fault notions of negligence law so incongruous in a strict liability setting. The court seemingly holds, therefore, that it is error to charge

---

**6.** Plaintiff's argument that our instructions concerning "defective condition" and "unreasonably dangerous" were erroneous under pre-*Berkebile* law is wholly insubstantial. Plaintiff also directs our attention to several alleged errors relating to issues other than the defect question. We reject these contentions as meritless. Since the jury, following our special interrogatories found no unreasonably dangerous defect, it did not reach other issues such as proximate cause, assumption of risk, or abnormal use which it might have considered had it found a defect.

**7.** See *Passwaters v. General Motors*, 454 F.2d 1270 (8th Cir. 1972). In *Passwaters* the District Court had directed a verdict for the defendant on plaintiff's strict liability in tort theory, in accordance with the then prevailing law of Iowa which did not recognize such a theory of recovery in products liability cases. While appeal was pending the Iowa Supreme Court recognized strict liability principles in products liability cases for the first time. Applying the then prevailing state law the Court of Appeals for the Eighth Circuit reversed and remanded for a new trial on the strict liability issue. See also *Springfield State Bank v. National State Bank of Elizabeth*, 459 F.2d 712 (3d Cir., 1972) (In federal question context, where Banking Act of 1933, Rev.Stat. § 5155, 12 U.S.C. § 36, required reference to state law; *held* retrospective application of change in state law required.)

**8.** In addition to its consideration of what constitutes the proper instruction on "defective condition," discussed in text *infra*, the opinion also (1) instructs that foreseeability is not properly included in an instruction on proximate cause; (2) reconsiders the admissibility and function of evidence of plaintiff's abnormal use; (3) restates the inapplicability of contributory negligence principles as part of the assumption of risk defense; (4) suggests that a failure to warn or provide instructions may be deemed a defect.

**9.** See also *Glass v. Ford Motor Co.*, 123 N.J. Super. 599, 304 A.2d 562 (Superior Court, Law Division, 1973), a published opinion of a New Jersey trial court.

the jury that a defect must be "unreasonably dangerous to the user" as a prerequisite to recovery. More precisely it states that:

> "the 'reasonable man' standard in any form has no place in a strict liability case. The salutary purpose of the 'unreasonably dangerous' qualification is to preclude the seller's liability where it cannot be said that the product is defective; this purpose can be met by requiring proof of a defect.[10]

> To charge the jury or permit argument concerning the reasonableness of a consumer's or seller's actions and knowledge, even if merely to define 'defective condition' undermines the policy considerations that have led us to hold in *Salvador* [*v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 319 A.2d 903] that the manufacturer is effectively the guarantor of his product's safety. The plaintiff must still prove that there was a defect in the product and that the defect caused his injury; but if he sustains this burden, he will have proved that as to him the product was unreasonably dangerous. It is therefore unnecessary and improper to charge the jury on 'reasonableness.'"

337 A.2d at 900. There may be some confusion caused by the less than direct language of the opinion on whether "unreasonably dangerous" is an improper qualification of "defective condition" in any and all jury instructions. Since the Court does not disavow § 402A and since "unreasonably dangerous" is not expressly deleted, it may be that a jury charge, carefully phrased so that the danger that fault notions will influence the jury is minimized, would survive scrutiny under *Berkebile*.[11]

On the other hand, a fair reading of the opinion might be as follows: the phrase "unreasonably dangerous to the user or consumer" is stricken from § 402A in Pennsylvania, which otherwise remains fully applicable in Pennsylvania products liability law. Plaintiff may recover, then, by showing that the defendant sold a product in a defective condition that was the proximate cause of plaintiff's injuries. In addition, any further elaboration of "defective condition" which employs language that "rings in negligence," such as references to ordinary consumers or sellers, normal use of the product, or conditions within the contemplation of the consumer, is not a proper part of § 402A. Yet the seller of products is not yet an *insurer* of his product under this view; if he were, a plaintiff would only be required to establish that he was injured by a defendant's product without regard to its condition. One who engages in the business of selling products is only the *guarantor* of his products' safety, according to *Berkebile*. The plaintiff must therefore prove not only that a product proximately caused his injury but also that a defective condition in the product caused the injury.

Assuming the latter is a fair interpretation of *Berkebile*, we perceive several difficulties. First, an examination of Pennsylvania appellate decisions interpreting § 402A reveals that the text and the comments, including in particular comments g, h and i, have been solidly engrafted into Pennsylvania law without reservation. In the absence of an unequivocal rejection of any specific aspect of § 402A by a majority of the Pennsylvania Supreme Court we hesitate to impute such an intention to that Court, sit-

---

10. Some confusion may be engendered by this last-quoted sentence. Compare the following sentence in the immediately preceding paragraph: "[t]he purpose of the 'unreasonably dangerous' clause would appear best served by its inclusion in the issue of proximate cause." 337 A.2d at 899.

11. *Compare Cronin v. J. B. E. Olson Corp.*, 8 Cal. 3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), where the California Supreme Court, perhaps sensing that the deletion of "unreasonably dangerous" disembowels § 402A, expressly abandons § 402A and announces their intention to develop common law principles of strict liability in tort; *with Glass v. Ford Motor Co.*, *supra* note 9, where the New Jersey Superior Court retains § 402A and explicitly deletes "unreasonably dangerous."

ting as we do in our capacity as a federal diversity court interpreting Pennsylvania law. Second, we believe that the phrase "defective condition unreasonably dangerous to users" is a unitary concept and that the purpose of the draftsmen would be frustrated by severing from it "unreasonably dangerous" without substituting another suitable phrase which tends to clarify the meaning of "defective condition." In our view the inclusion of "unreasonably dangerous" serves two overlapping functions in the § 402A formulation of strict liability.[12] We believe it denotes that the draftsmen of the Restatement intended to foreclose the possibility that "defective condition" might be construed to include any characteristic of a product capable of inflicting injury. In addition, is signifies that jurors should not resort to their intuitive understanding of "defective condition" but rather that they should be guided by an objective standard based on community expectations of product safety. In an effort to highlight the uncertainty that deleting this crucial language in § 402A would cause we turn to a brief examination of Pennsylvania's experience with that section.

### III.

In *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), Pennsylvania joined the many jurisdictions that apply strict liability in tort principles to sellers of commercial products whose products cause injury to users or consumers. In so doing the Pennsylvania Supreme Court adopted the language of § 402A of the Restatement of Torts, Second, verbatim, and prior to 1975 it had never wavered in its precise adherence to the letter of that section. In the decade since § 402A was adopted the Pennsylvania Supreme Court has expressed unqualified approval for the language and the comments of § 402A, where doubts arose as to its propper interpretation.[13] By contrast, the Pennsylvania high court has never rejected the language of the comments. Understandably, then, the courts in framing jury instructions in § 402A cases have turned to the language of the comments for guidance where explicit case law is absent.[14]

The Restatement version of strict liability for commercial sellers of products requires a plaintiff to prove as part of his prima facie case that the product was sold "in a defective condition unreasonably dangerous to the user or consumer" and that such defective condition caused the plaintiff's injury. The seller's liability is not negated or mitigated by the fact that "the seller has exercised all possible care in the preparation and sale of the product." § 402A(2)(a). It is thus emphatically clear that negligence principles should play no part in § 402A litigation. Yet the draftsmen of the Restatement did not intend to impose absolute liability on the seller; to

---

12. See generally, Wade, On the Nature of Strict Tort Liability for Products, 44 Miss. L.J. 825 (1973); Prosser, Strict Liability to the Consumer in California, 18 Hast.L.J. 9 (1966); Traynor, The Ways and Meanings of Defective Products and Strict Liability, 32 Tenn.L.R. 363 (1965).

13. See *Forry v. Gulf Oil Corp.,* 428 Pa. 334, 237 A.2d 593 (1968), where the Court assumes, without so stating, that the comments are authoritative explanations of the text of § 402A. (Comments d, f, g, i cited with approval). See also *Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 242 A.2d 231 (1968) (comments c, f and g); *Burbage v. Boiler Engineering and Supply Co.,* 433 Pa. 319, 249 A.2d 563 (1969) (comments g and n); *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971) (comments h and j); *McCown v. International Harvester Co.,* Pa., 342 A.2d 381 (1975) (comment n).

14. See, e. g., *Dorsey v. Yoder Co.,* 331 F.Supp. 753 (E.D.Pa.1971), aff'd 474 F.2d 1339 (3d Cir. 1973) (comments g, h, i, j and p); *Dennis v. Ford Motor Co.,* 332 F.Supp. 901 (W.D. Pa.1971), aff'd 471 F.2d 733 (3d Cir. 1973) (comments p and q); *Dyson v. General Motors Corp.,* 298 F.Supp. 1064 (E.D.Pa. 1969) (comments h, i and j); *Greco v. Bucciconi Engineering Co.,* 283 F.Supp. 978 (W.D.Pa.1967), aff'd 407 F.2d 87 (3d Cir. 1969) (comments p and q); *LaGorga v. Kroger Co.,* 275 F.Supp. 373 (W.D.Pa.1967), aff'd 407 F.2d 671 (3d Cir. 1969) (comments c and h).

the extent that "defective condition" might be construed to include any characteristic of a product capable of inflicting injury, the Restatement provides that recovery can be had only for injuries caused by products "in a defective condition *unreasonably dangerous to the user.*" [Emphasis added]. The result, it was hoped, would be that there would be no liability where, for example, a diabetic consumed pure sugar and suffered shock, or where quality whiskey consumed to excess caused physical illness. § 402A, comment i. Even if such characteristics could be deemed a defective condition by a jury, surely they could not be regarded as unreasonably dangerous. The test, the Restatement explains, is that "the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with knowledge common to the community as to its characteristics." [15] *Id.* Significantly, prior to *Berkebile* no appellate decision of the Pennsylvania courts had intimated any reservations about the requirement that plaintiffs must prove a defective condition unreasonably dangerous to the user. See *Webb v. Zern, supra; Bartkewich v. Billinger,* 432 Pa. 351, 247 A.2d 603 (1968); *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971).

There is much to be said for the view that the "unreasonably dangerous" language is an integral part of § 402A that promotes rather than undermines the social policy that the Restatement strives to advance. Indeed it may be argued that the "unreasonably dangerous" language, properly defined, is an indispensable part of what the draftsmen of § 402A foresaw as the appropriate extent of a product seller's strict liability in tort.

The comments nowhere mention "defective condition" without modifying it by means of some phrase which ultimately "rings in negligence." [16] Comment g defines a defective condition as one "not contemplated by the ultimate consumer, which will be *unreasonably dangerous* to him." Comment h cautions that "a product is not in a defective condition when it is safe for *normal* handling and consumption." "The article sold," explains comment i, "must be dangerous to an extent beyond that which would be contemplated by the *ordinary consumer* who purchases it, with *ordinary knowledge* common to the community as to its characteristics." [Emphases supplied.]

The italicized terminology "rings in negligence" to the extent that the duty of care in negligence cases is customarily measured in terms of the reasonable man standard, which in turn is couched in terms of how the ordinary, prudent man would act in similar circumstances. Negligence principles could scarcely be implemented in a rational manner if a jury were instructed merely that a defendant in a given case is liable if he breached his duty of care to the plaintiff, thereby causing him damage. Jurors in negligence cases, therefore, are given a flexible and comprehensible standard to measure a defendant's conduct against in order to ascertain whether the duty has been breached.

Likewise in a § 402A case where the jury is asked to determine whether a product was in a defective condition, a jury would have to resort to bare intuition if it were given no standard by which to gauge whether a particular product was sold in a defective condition. By limiting sellers' liability to products sold in a defective condition unreasonably danger-

15. Moreover, there is a class of unavoidably unsafe products which cannot be made safe even for their intended and ordinary use. Yet § 402A contemplates no seller's liability for harm caused by such products because the social utility of the product outweighs the risk of harm. An example of such a product is rabies vaccine, the administration of which causes much pain and harmful side effects. Unavoidably unsafe products will not give rise to liability, because they are neither defective nor unreasonably dangerous. Comment k.

16. *Berkebile* quoted approvingly the language employed by the California Supreme Court in *Cronin v. J. B. E. Olson Corp., supra,* which identified the fatal defect of "unreasonably dangerous" as the fact that it "rings in negligence." Pa., 337 A.2d at 899.

ous to users, the social policy of placing the burden of accidental injuries caused by products upon those who market them is given ample protection. See comment c. No constructive social policy would be fostered by permitting juries with an overly broad intuitive understanding of defective condition to render the seller of a product an insurer against any and all injuries thereby caused. Likewise the deterrence and compensation functions of § 402A would be subverted if a jury applied its own lax standards of product safety to ascertain whether a particular product was in a defective condition. Instead § 402A imposes the unreasonably dangerous standard; the jury must evaluate the alleged defect to determine whether it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics." Comment i. Despite the use of words that in a sense "ring in negligence," careful jury instructions modeled after comments g, h and i of § 402A properly focus the jury's attention on the *condition* of the product; the *conduct* of both the seller and the consumer are made irrelevant. In that sense, then, the essential distinction between negligence and strict liability is preserved.

## IV.

■ We need not, however, at this time resolve troublesome questions about the meaning of *Berkebile*. For if the opinion is hobbled by ambiguity and inconsistency and if it does in fact disembowel § 402A by excising from the Restatement without adequate replacement a standard by which the scope of a seller's liability for defects may be measured, it suffers from a far graver defect, which we regard as fatal to the acceptance of *Berkebile* as the new law of strict liability in Pennsylvania. Although the Pennsylvania Supreme Court was unanimous in its judgment that the trial court had erred and that a new trial was warranted under the circumstances, only two of seven justices signed the opinion of the court. Justices Roberts and Pomeroy wrote separate concurring opinions in which they announced approval for the judgment on very narrow grounds, neither encompassing the "unreasonably dangerous" issue. Three other justices simply concurred in the result. Since none of the five concurring justices articulated their agreement with any aspect of Chief Justice Jones' opinion, we cannot attribute to them approval of that opinion's disposition of the "unreasonably dangerous" issue unless we are to indulge in bare speculation. Particularly is this so where we are called upon to construe a multi-faceted opinion that purports to resolve several distinct issues, and where any or all of the five concurring justices could have stated the areas in which they agreed or disagreed with the "opinion of the court." Since we draw no inferences from the concurring opinions or from the unexplained concurring votes, the *Berkebile* opinion represents the personal views of only two members of the Court, less than a majority of those justices of the Pennsylvania Supreme Court sitting on the case. Consequently we accord no precedential value to the opinion, and we treat Pennsylvania strict liability law as unchanged. *Burak v. Commonwealth,* 339 F.Supp. 534 (E.D.Pa.1972).

Our approach is fully consonant with Pennsylvania's own law concerning the precedential weight of its less than majority opinions. In *Commonwealth v. Little,* 432 Pa. 256, 248 A.2d 32 (1968), the Pennsylvania Supreme Court declined to follow a prior opinion which represented the views of only two justices in a four man majority, stating: "[t]hat opinion, joined by only one other member of this Court, has no binding precedential value." 432 Pa. at 260, 248 A.2d at 35 Several years later the Court, refusing to rely on a minority opinion, stated that such an opinion "did not express the views of a majority of the Court, and, therefore, is not decisional." *Commonwealth v. Silverman,* 442 Pa. 211 (n. 8), 275 A.2d 308 (n. 8) (1971).

The decision of the Court in *Bata v. Central-Penn National Bank of Phila-*

*delphia,* 448 Pa. 355, 293 A.2d 343 (1972), cert. denied, 409 U.S. 1108, 93 S.Ct. 910, 34 L.Ed.2d 689, reh. denied, 410 U.S. 960, 93 S.Ct. 1417, 35 L.Ed.2d 695 (1973) (*Bata III*), is also instructive. Five members of the Pennsylvania Supreme Court had participated in *Bata II,* 433 Pa. 284, 249 A.2d 767 (1969), affirming by a 4–1 majority the power of the trial court to impose fines for indirect civil contempt. Of the four justices voting to affirm two expressed the view that they would, however, limit the amount of fine levied and the extent of plaintiff's damage recovery for the contempt. In *Bata III* the defendants argued that the two judge concurrence in *Bata II* established a damage limitation which the trial court was obliged to apply. This argument was rejected by the Court, which held:

> "our *Bata II* opinion was in fact an affirmance, by an evenly-divided vote of two to two, of the trial court's holding that there would be no arbitrary limitation on the appellee's right to recover for the damages occasioned by appellant's contempt."

448 Pa. at 373, 293 A.2d at 353. In short, on the issue of damage limitations the Court expressed no view which could have any precedential value.

■■ Taking *Little, Silverman* and *Bata III* together, we think the Pennsylvania Supreme Court would take the following approach: in interpreting the split opinion of a Pennsylvania appellate court one must add up the votes on each issue addressed by an opinion of the court; only those holdings which muster majority approval may be accorded precedential value. Thus, where, as in *Berkebile,* an opinion addresses several different issues, and where no part of the opinion appears to have the approval of a majority, the opinion reflects only the personal views of its author and is not endowed with the force of law. We therefore hold that the views expressed in Chief Justice Jones' opinion in *Berkebile* are not the law of Pennsylvania, and that it is proper to instruct a jury that it must find that a defective condition be unreasonably dangerous to the user or consumer. Accordingly, plaintiff's motion for a new trial is denied.[17]

17. Our resolution of this issue is not undermined by *Commonwealth v. Mason,* 456 Pa. 602, 322 A.2d 357 (1974). In *Mason* the Pennsylvania Supreme Court held that a 3–2 decision of a five man panel sufficed to establish a controlling precedent, where all three members of the majority signed the opinion. All that is required after *Mason,* then, is an opinion expressing the views of a majority of those justices participating in the case. This is manifestly not the issue posed by *Berkebile.*

Additionally there is language in *Mason* which suggests that the issue of the precedential value of opinions which represent the views of less than a majority of those participating may still be an open question:

> "Whatever the effects of an opinion supported by less than a majority of those justices participating may be, there can be no doubt that when a majority of those justices participating join in the opinion, it becomes binding precedent on the courts of Pennsylvania."

456 Pa. at 604, 322 A.2d at 358. By the above statement the Court seems to treat as an unanswered question that which its previous decisions had assumed as settled. *Mason* cites neither *Little* nor *Bata III* nor, for that matter, any authority in support of its statement. Even if we are, in fact, deciding an open question of Pennsylvania law, our resolution of the issue stands on a firm alternate ground. As a federal court in a diversity case we are, of course, required to apply the substantive law of Pennsylvania. Where we must resolve an unanswered question of state law, we must exercise our sound discretion, seeking to resolve the issue as would a Pennsylvania appellate court in the same situation. *Beavers v. West Penn Power Co.,* 436 F.2d 869 (3d Cir. 1971). Taking as our premise that Pennsylvania has not directly decided what precedential value must be accorded to an opinion signed by less than a majority of those judges participating in a case, we have found not the slightest hint in any decision that such an opinion is controlling authority. On the other hand, we have cited numerous cases of recent vintage which suggest that the opposite is true. See *Little, Silverman* and *Bata III,* discussed in text *supra.*

Postdating *Mason* and *Berkebile,* the recent decision of the Pennsylvania Supreme Court in *Commonwealth v. Davenport,* Pa., 342 A.2d 67 (1975) further buttresses our conclusion. The Court there observes that the trial court erred in treating a less than majority opinion of the Supreme Court as dispositive of the issues on remand of the same case. *Id.* (n. 3), 342 A.2d at 75 (n. 3).