Robert C. SCHELL et al., Plaintiffs,

v.

AMF INCORPORATED et al., Defendants.

Civ. No. 74–190S.

United States District Court, M. D. Pennsylvania.

Nov. 24, 1976.

Philip D. Freedman, Caldwell, Clouser & Kearns, Harrisburg, Pa., for plaintiffs.

James K. Thomas, Metzger, Hafer, Keefer, Thomas & Wood, Edward E. Knauss, III, Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for defendants.

OPINION

MUIR, District Judge.

The above-captioned case was originally assigned to the late Chief Judge Sheridan and a mistrial therein was declared by him on February 9, 1976, when the jury was unable to reach a verdict. Following Judge Sheridan's death on August 23, 1976, the case was reassigned to the undersigned judge on October 1, 1976. During the trial, Judge Sheridan had denied motions for a directed verdict made by the Defendant AMF, Incorporated. Currently pending is AMF's motion for judgment pursuant to F.R.Civ.P. 50(b). Viewing the testimony and evidence in the light most favorable to

the non-moving party, the facts out of which this case arises are as follows:

On March 13, 1972, Plaintiff Robert C. Schell was injured during the course of his employment at the Harrisburg Plant of third-party Defendant Capital Bakers, Inc. The machine which was involved in the accident was a "Pan-O-Mat" manufactured by Union Machine Company, which is now a part of AMF. The Pan-O-Mat's function in the baking process is to receive roll-shaped pieces of bread dough from another machine and place them on baking pans to "rest". The unbaked rolls are fed from the preceding machine onto a series of cups which are conveyed upwardly by the Pan-O-Mat toward the falling dough. At the transfer point, the dough occasionally misses the appropriate cup and falls to the floor beneath the Pan-O-Mat. In order to collect the fallen dough, the machine which is the subject of this suit is equipped with an "excess" tray which fits beneath it.

The conveyor to which the Pan-O-Mat's receiving cups are attached is driven by a series of chain and sprocket drives. On each side of the machine is a large guard door which blocks access to the working mechanisms. By making use of a gap between the door bottoms and the floor, the excess tray is designed to slide freely from beneath the guards on either side of the machine. The tray can be removed, emptied, and replaced without opening either guard door or shutting down the Pan-O-Mat. Use of the excess tray during a production run is necessary to avoid a build-up of dough which could eventually foul the working mechanisms of the machine.

In order to comply with baking industry sanitation standards, accessibility to the area behind the guard doors is required and that area is cleaned at least every four hours.

On March 12, 1972, Schell reported to work at approximately 11:00 P.M. During the early part of his 9-hour shift, Schell performed his usual job of feeding pans into the Pan-O-Mat. About 15 minutes before the accident, he was given the responsibility of operating the machine—a task he had not previously performed. As operator, he was required, *inter alia*, to prevent a dough build-up beneath the Pan-O-Mat. Schell observed that excess dough at the bottom of the machine and behind the door had accumulated to such an extent that the tray could not be removed without opening the guard door. He and a fellow worker opened the door and removed the tray full of dough. His co-worker did not help Schell empty the tray and it was too heavy for Schell to accomplish alone. Consequently, the machine continued to operate without an excess tray in position. Schell returned to the Pan-O-Mat and attempted to brush away dough that was accumulating beneath the machine. With the door still open and the Pan-O-Mat running, he went down to his knees, leaning with his left hand on the floor and intending to reach into the area ordinarily occupied by the excess tray. At that moment, he lost his balance and his arm became entangled in the chain and sprocket mechanism of the Pan-O-Mat. His injuries were so severe that amputation was required.

Schell sued AMF alleging a right to recovery under the doctrine of "strict liability" as embodied in § 402A of the Restatement (Second) of Torts and as adopted by Pennsylvania in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966).[1] The alleged defects in the Pan-O-Mat are:

 (1) The absence of an interlock mechanism which shuts down the machine when a guard door is open;

1. The Restatement provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer.

 (1) One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.

(2) The absence of a warning on the guard doors;

(3) The use of closing mechanisms on the guard doors which allow the door to be opened quickly and without reflection.

AMF contends that, as a matter of law, Schell has failed to demonstrate an essential element of a cause of action under § 402A—that the Pan-O-Mat was in a "defective condition".

█ § 402A speaks in terms of a product in "a defective condition *unreasonably dangerous* to the user or the consumer . ." (Emphasis added.) In *Berkebile v. Brantly Helicopter Corporation*, 462 Pa. 83, 337 A.2d 893 (1975), it was "held" that the requirement of "unreasonably dangerous" no longer need be proven as an element of strict liability in Pennsylvania. The opinion of Chief Justice Jones was joined by one other justice. Three other justices concurred in the result only and two concurred specially. The Court of Appeals for the Third Circuit has concluded that because of this judicial array *Berkebile* is not binding as the law of Pennsylvania with respect to strict liability. *Bair v. American Motors Corporation*, 535 F.2d 249 (3 Cir. 1976), citing with approval *Beron v. Kramer-Trenton Company*, 402 F.Supp. 1268 (E.D.Pa.1975). This Court, in accord with the analysis in *Beron*, is of the view that "defective condition unreasonably dangerous to the user or consumer" is a unitary concept whose meaningfulness as a legal principle would be seriously undermined by an adoption of *Berkebile's* analysis. "Defect" is not a metaphysical concept which exists in a vacuum. Rather, it must have some relationship to the day-to-day conduct of human affairs. "Unreasonably dangerous to the user" provides that framework. Consequently, the Court will ignore any change in the outcome of this case which would result by an application of *Berkebile*, although it is doubtful that such would be the case.

(2) The rule stated in subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and

In *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603 (1968), the plaintiff was operating a machine used to break and stack glass strips. Bartkewich was working on one side of the machine while his supervisor operated the controls on the other side. With the machine still in operation, the supervisor departed. Shortly thereafter, Bartkewich noticed glass jamming in the machine at a point where this did not ordinarily occur. Believing that the machine was being damaged, he attempted to remove a piece of glass with his hand without shutting off the machine. His glove became caught and he was injured.

Bartkewich contended that the machine was defectively designed because it lacked an on-off switch on both sides of the machine and a barrier to prevent individuals from placing their extremities into it. The case was submitted to a jury which returned a verdict in his favor. The Pennsylvania Supreme Court, analyzing the case solely as one based on § 402A strict liability, reversed. The Court was of the view that the doctrine of strict liability ". . . should only apply to allow recovery where the absence of a safety device caused an accidental injury which was of the type that could be expected from the normal use of the product." At 354, 247 A.2d at 605. The Court further remarked that Bartkewich ". . . voluntarily did exactly what was obviously dangerous—reached into an operating glass breaking machine." At 355, 247 A.2d at 605. The Court continued:

"It is unfortunate that [Bartkewich] incurred a serious injury, but we do not believe that [the Defendant] was obligated to build a machine that was designed not only to keep glass in, but also to keep people out. Nor do we believe that [the Defendant] was required to strategically locate (sic) on-off switches around the machine, in the expectation that someone [like Bartkewich] would put himself in an obviously dangerous position by reaching

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
Restatement (Second) of Torts § 402A (1965).

into the moving machine rather than walking around to where he knew the controls were . . . [T]he switch was easily accessible and would have provided a safe and efficient means of stopping it." At 355, 247 A.2d at 605.

 *Bartkewich* remains unaltered by any subsequent Pennsylvania decision. Consequently, the question before this Court is whether, as a matter of law, the absence of an interlock shut-off device, the absence of a warning on the guard doors, and the use of readily openable latches caused an injury to Schell which was of the type that could be expected from the normal use of the Pan-O-Mat. The Court answers this question in the negative and, consequently, will grant AMF's motion for judgment pursuant to F.R.Civ.P. 50(b).

Although one might anticipate that the question of "normal use" would be a jury question in each case and preclude the entry of judgment in favor of a defendant as a matter of law, the *Bartkewich* court declined to reach this conclusion. Thus, unless there is some factual difference between this case and *Bartkewich*, judgment for AMF is ineluctable.

Except for unimportant nuances created by factual variations, this Court is of the view Schell's conduct is indistinguishable from Bartkewich's and that the Pan-O-Mat lacked no safety device which caused an injury which was of the type that could be expected from its normal use. Schell's actions created a risk to himself against which AMF had no duty to guard. AMF was not required to design a machine ". . . which would prevent a person from *voluntarily putting himself* at so obvious a risk." *Bartkewich* at 356, 247 A.2d at 606, emphasis in original.

Schell contends that his concern about his employer's reaction to a shutdown of the machine compelled him to attempt to reach beneath the operating Pan-O-Mat in order to clear away the excess dough which was accumulating there. Assuming, as must be done for purposes of this motion, that Schell's concern was real

and motivated his action, the Court does not perceive how this bears on AMF's liability. Either the Pan-O-Mat is in a "defective condition" with respect to protection against injuries which are likely to occur from the normal use of the machine or it is not. Its "defectiveness" is not governed by the particular circumstances which lead to a particular accident. AMF cannot be held liable if a purchaser of a Pan-O-Mat coerces its employees to use the machine in an abnormal manner.

The Court, in granting AMF's motion for judgment at this time, intends absolutely no disrespect for Judge Sheridan's denials of AMF's motions for a directed verdict made at trial. Rulings made during the press of trial often differ from those made after the verdict has been returned and the Court has had the benefit of briefing and time for reflection. Given the extreme complexity of this case, I have no doubt that I also would have denied the motion for directed verdict made during the course of the trial.

An appropriate order will be entered.