Thelma GREINER, Appellant,

v.

VOLKSWAGENWERK AKTIENGE-SELLESCHAFT and Volkswagen of America, Inc., Appellees.

No. 75-1665.

United States Court of Appeals, Third Circuit.

Argued Jan. 20, 1976.

Decided June 29, 1976.

46. ICC Report, *supra* note 7, at A–174.

Marshall A. Bernstein, Bernstein, Bernstein & Harrison, Philadelphia, Pa., for appellant.

Edward W. Madeira, Jr., David R. Scott, Judith N. Dean, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees.

Before HUNTER, BIGGS and GARTH, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judges.

This suit presents difficult questions under Pennsylvania law of evidence and strict tort liability. Jurisdiction is grounded on diversity. On this record we must decide whether Pennsylvania law would admit evidence of the drinking of alcoholic beverage by an auto driver involved in a collision with another vehicle. Further we must determine whether the District Court properly charged the jury on Pennsylvania strict liability precedent.

## I. Facts

On Saturday evening, April 29, 1972, the appellant, Thelma Greiner, with two other passengers, was in a 1966 Volkswagen Beetle ("VW") driven by Judith Nickel. The group was proceeding north toward a stone bridge on a two-lane rural highway in Delaware County, Pennsylvania. The roadway south of the bridge curves to the right and then curves left over the bridge. Nickel was cautioned about the dangerous approach to the bridge but nonetheless she drove at a speed between 30 and 60 miles per hour.[1] Approaching the other side of the bridge was a car driven by James Cunningham. He observed the VW's fast approach to the bridge and, therefore, in fear of an accident, brought his car to a halt. Nickel was in the opposite lane as she approached the bridge. As soon as she saw the headlights of Cunningham's car, she swerved the VW to the right; then realized she was heading for a concrete bridge railing and swerved to the left. It is not clear whether the car hit the bridge curb.[2] The VW rolled over on its side, coming to tragic repose with its roof against the front of Cunningham's car. Greiner, a passenger, was so seriously injured in the accident that she was rendered permanently paraplegic. State Trooper Koper, who appeared on the scene very soon after the accident, estimated that Nickel was driving in excess of the speed limit and at about 50 miles per hour. Koper gave Nickel a summons for driving in excess of the speed limit and to this charge Nickel pleaded guilty.

On January 11, 1974, Greiner filed a complaint in the United States District Court for the Eastern District of Pennsylvania against appellees Volkswagenwerk Aktiengesellschaft, Volkswagen of America, Inc., and Volkswagen Atlantic, Inc.[3] The complaint alleged that the appellees negligently designed, manufactured, and sold the VW. The complaint also alleged breach of warranty and strict liability in tort for selling a defective product unreasonably dangerous to users. The appellees answered and cross-claimed against Nickel and her employer, the owner of the VW. The employer third-party claim was dismissed with prejudice on the day the trial began. The

---

1. The testimony as to the exact speed varied widely as indicated.

2. Appendix, *infra*, at 25–26 (charge to jury).

3. Volkswagen Atlantic, Inc. was dismissed as a party by a stipulation on June 10, 1974.

Nickel claim was dismissed by the final judgment.

The case was tried to a jury beginning on April 7, 1975. Greiner put on the stand two expert witnesses, who described the design and handling characteristics of a 1966 VW. Both testified that the VW had a tendency to overturn. These witnesses concluded that this tendency, in their opinion, was the cause of the overturning of the VW. On the other hand, the appellees put on the stand their own expert witnesses, who concluded that the overturning of this vehicle was caused by "tripping".[4] There was also evidence that Nickel, the driver, had imbibed two alcoholic drinks prior to the accident.

Before trial counsel for Greiner informed the court that he would proceed under a theory of strict liability alone. Transcript of Final Pretrial Conference, p. 3. At the end of trial Greiner requested the court to submit an interrogatory to the jury on the issue as to whether the VW was defective because of the appellees' failure to warn. The court refused to submit this issue to the jury, apparently finding that the warning would have been ineffective in the context of this accident or, in the alternative require a finding by the jury of design defect and thus amount to a superfluous additional basis of liability. Notes of Trial, pp. 10–120 to 10–123. The trial Judge instructed the jury, over the appellant's objection, on the issue of whether the VW was being put to normal or abnormal use under Pennsylvania strict liability law. Appellant objects here to the Judge's charge because it required the jury to find any defect "unreasonably dangerous" in normal use as a predicate to liability.

The court submitted the following interrogatories to the jury and received the following answers in favor of the appellees:

1. Was the Volkswagen, at the time it was sold in 1966, by reason of its design, in a defective condition, unreasonably dangerous for normal use?   _NO_

2. If your answer to the previous question was yes, was such defective design a substantial factor in causing the accident?   ____

3. Do you find that the Volkswagen was defective by reason of the fact that it malfunctioned, that is, overturned? _·NO_

4. If your answer to the previous question was yes, was such malfunction a substantial factor in causing the accident?   ____

5. Do you find that Judith Nickel was negligent in the operation of her Volkswagen?   _YES_

6. If your answer to the previous question was yes, was her negligence a substantial factor in causing the accident?   _YES_

## II. Law

### A. *Issue of Drinking by Nickel*

There was evidence that Nickel had consumed two alcoholic drinks prior to driving the VW on its disastrous trip. Greiner early moved to suppress any testimony regarding Nickel's drinking on the night of the accident. The trial Judge, however, denied the appellant's motion and ruled that evidence of Nickel's drinking, since it was coupled with other evidence of reckless driving, could be used by the jury to consider the issue of whether Nickel's driving was a substantial cause of the accident. Greiner contends that the admission of this evidence was contrary to the established rules. We disagree.

The trial Judge in interpreting the Pennsylvania cases stated: "I believe that in essence the rule is this: That evidence of drinking standing alone is inadmissible unless there is evidence that would permit a conclusion of intoxication resulting in a lack of fitness to drive. However, where there is other evidence of reckless driving, evi-

---

**4.** Note 1 of Appellees' brief states as follows: "Tripping occurs when the acceleration of the lower part of the vehicle is stopped considerably faster than the upper portion of the vehicle. Accordingly, a car may be 'tripped' if it hits a large hole in the road surface, hits a soft dirt shoulder or strikes a curb." The appellant does not deny the accuracy of this description, but does not admit that the accident was caused by tripping.

dence of drinking is then admissible to be considered by the jury in connection with all of the evidence. . . ." The court then stated: "I will therefore admit that evidence as to Judith Nickel, since I believe, on the facts given to me, there is evidence of reckless driving; mainly, the length of the skid marks, the fact that she admitted she was driving on the wrong side of the road, the . . . proffered evidence of the two Cunninghams, and the admission of excessive speed in a [40] mile an hour zone." Notes of Trial, page 8.

■ *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), compels us to follow the law of Pennsylvania. Greiner argues that *Fisher v. Dye*, 386 Pa. 141, 125 A.2d 472 (1956), established a "black letter rule" in her favor, saying, ". . . while proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." 386 Pa. at 148, 125 A.2d at 476. *Morreale v. Prince*, 436 Pa. 51, 258 A.2d 508 (1969) (Roberts, J.).

However, drinking evidence insufficient to establish intoxication can come in if it is coupled with other evidence supporting an inference of intoxication.[5] In *Commonwealth v. Cave*, 219 Pa.Super. 512, 515, 281 A.2d 733, 734 (1971), the Pennsylvania Superior Court stated: "It is true that the 'mere' drinking of intoxicating liquor is inadmissible to prove that a driver was under the influence of intoxicating liquor and unfit to drive an automobile. However, it is also true that if in addition to the drinking, facts are shown from which a conclusion reasonably follows that the driver was under the influence of intoxicating liquor, all the evidence, the drinking and the surrounding circumstances are admissible for the consideration of the trier of facts to determine whether or not the drinking was wholly or partly the cause of an accident for which he is being held responsible." See also *Critzer v. Donovan*, 289 Pa. 381, 137 A. 665 (1927). Subsequent Superior Court cases have held that this foundation for drinking evidence not establishing intoxication must go to the issue of fitness to drive. *Sentz v. Dixon*, 224 Pa.Super. 70, 302 A.2d 434 (1973); *Kriner v. McDonald*, 223 Pa.Super. 531, 302 A.2d 392 (1973).[6] Evidence permitting inference of unfitness has included: high rate of speed, crossing a solid dividing line on the highway, and inability of the other party to the accident to avoid collision, despite precautionary measures. *Cave, supra.* Only such evidence supporting an inference of unfitness due to intoxication is sufficient to outweigh possible prejudice. The Pennsylvania courts have been vigilant in curbing such prejudice. *Wentworth v. Doliner*, 399 Pa. 356, 160 A.2d 562 (1960); *Kriner, supra*, 223 Pa.Super. at 533, 302 A.2d at 394.

**5.** Cases cited by appellant deal with evidence of drinking unaccompanied by unusual conduct: *Billow v. Farmers Trust Co.*, 438 Pa. 514, 266 A.2d 92 (1970) (evidence of blood alcohol content of .14 alone insufficient); *Vignoli v. Standard Motor Freight, Inc.*, 418 Pa. 214, 210 A.2d 271 (1965) (evidence of consumption of two beers several hours prior to accident coupled with evidence of unusual behavior at scene of accident is insufficient); *Fisher v. Dye, supra* (evidence of drinking at a club insufficient); *Critzer v. Donovan*, 289 Pa. 381, 137 A. 665 (1927) (liquor smell on driver's breath after accident insufficient, the Supreme Court noting that there was no evidence of conduct or appearance from which one could reasonably infer intoxication); *Sentz v. Dixon*, 224 Pa.Super. 70, 302 A.2d 434 (1973) (reference to alcohol on the breath insufficient); *Kriner v. McDonald*,

223 Pa.Super. 531, 302 A.2d 392 (1973) (deceased pedestrian had just left bar insufficient).

**6.** The appellant takes the position that the Pennsylvania Superior Court in *Commonwealth v. Carnes*, 165 Pa.Super. 53, 67 A.2d 675 (1949), distinguished between the use of drinking evidence under the standard in *Cave, supra*, in criminal "under the influence" cases and under civil negligence cases. We can perceive no such distinction. In *Carnes*, the court distinguished a civil case, *Critzer v. Donovan, supra*, but only on its facts. In that case there was evidence of the defendant recklessly swerving back and forth across the highway. This fact, coupled with the testimony that the defendant had a glass of beer, was deemed to be sufficient to meet the test of admissibility.

■ On this record the question is whether a proper foundation had been presented for the admissibility of Nickel's drinking, which, standing alone, did not establish intoxication. In *Miles v. Ryan*, 484 F.2d 1255 (3d Cir. 1973), this Circuit faced a similar problem, emphasizing the importance of a proper foundation under Pennsylvania law. *Id.* at 1257–58. There the Court held that the District Judge had not committed reversible error in refusing to admit evidence of drinking. In *Miles* there was more alcohol consumed, but, as in our case, insufficient in this Court's judgment to establish intoxication. See Dissenting Opinion, *id.* at 1260. However, *Miles* is distinguishable from our case here because the foundation for admissibility was weaker there.

In *Miles* the evidence as to drinking pertained to a witness who accompanied the defendant. The evidence of number of drinks consumed apart, it is not clear what foundation evidence supporting the inference of the witness' unfitness to observe and remember appeared in this record. 484 F.2d at 1257–58; 338 F.Supp. at 1066–67. Not only is this foundation evidence missing, but the manner in which the drinking evidence itself was obtained, as well as its relevance, was open to question. The evidence was given by the witness to a police officer after the accident, while he apparently was in some pain and wished to be left alone. It was contradicted by the witness' subsequent deposition. Further, at the time the admission decision was made, there was some question whether either the joint-liability or credibility of the witness would ever be at issue during the subsequent trial. 484 F.2d at 1257–58.

Here, as in *Cave, supra*, the evidentiary foundation was firmer. Erratic, reckless behavior inferring unfitness to drive due to intoxication was presented. Nickel was speeding on an unknown road, rural in character; she was on the wrong side going around a curve. She was oblivious to a cautionary warning by one of her passengers, who knew the road. Further, Nickel testified and her credibility was a major issue in the case. We think under Pennsylvania law there was adequate foundation for admission of evidence of Nickel's drinking.

■ Our result is supported by the substantial presumption we give to the correctness of the exercise of the trial Judge's discretion in these matters. *Kane v. Ford Motor Co.*, 450 F.2d 315 (3d Cir. 1971) (per curiam). In addition, Rule 43, FRCP, in effect at the time of this trial, required the Judge to adopt the most liberal rule available in favor of admission.

### B. *Issue of Defect Due to Failure to Warn*

Greiner contends that one of her bases of liability, VW defect due to failure to warn of possible dangerous propensity, should have been submitted to the jury. She argues that the Pennsylvania courts' interpretation of section 402A of the Restatement of the Law, Torts 2d[7] compels such a charge.

A threshold issue is the weight to give the Pennsylvania Supreme Court's treatment of *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975) *(Berkebile II)*. *Berkebile II* was decided on May 19, 1975. The case at bar went to the jury on April 22, 1975, and judgment was entered on April 24, 1975. The trial Judge did not have the advantage of the advices of the Justices of the Supreme Court of Pennsylvania.

---

7. "Topic 5. Strict Liability, 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

§ 402A. (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The Superior Court opinion, *Berkebile v. Brantly Helicopter Corp.*, 225 Pa.Super, 349, 311 A.2d 140 (1973) *(Berkebile I)*, had held that, under Pennsylvania strict liability law "[i]t [was] imperative that a jury hearing a case of strict liability in tort be aware of its duty to find liability where inadequate warnings exist, even in the absence of a defect in design, manufacture, or preparation of the product." 225 Pa.Super. at 354, 311 A.2d at 143. The Superior Court went on to note language from *Tomao v. A. P. DeSanno & Son*, 209 F.2d 544, 546 (3d Cir. 1954), to the effect that " 'latent limitations' " of a perfectly made article, dangerous to the user without notice, require warning by the manufacturer.

In *Berkebile II* the Supreme Court failed to articulate a majority view on this part of the *Berkebile I* holding, although it did affirm the lower court's order. An opinion was written by Chief Justice Jones, concurred in by Justice Nix, which argued that a defect exists when the seller fails to warn as to "the possible risks and inherent limitations of [the] product." 462 Pa. at 100, 337 A.2d at 902. Such a defect was independent of any design or manufacture defect, an independent basis of liability. Three other Justices concurred in the result, filing no opinion. Justice Roberts filed a concurring opinion, which did not address the warning issue and was limited to approving the result on the basis of another issue. At 104, 337 A.2d at 903–04. Justice Pomeroy filed a concurring opinion, arguing "[i]t is by now settled that a product which is perfectly made may nonetheless be 'unreasonably dangerous' if adequate warnings of the dangers involved in the use of the product are required and are not given by the seller." At 104, 337 A.2d at 904. Thus it can be said that three of seven Pennsylvania Supreme Court Justices have argued that failure to warn is an independent basis of strict liability under Pennsylvania law.

Since less than a majority of the court held the *Berkebile II* Jones view, his opinion must be treated only as an expression of the views of a minority of the court. *Bair v. American Motors Corp.*, 535 F.2d 249 (3d Cir., Filed May 17, 1976) (per curiam); *Beron v. Kramer-Trenton Co.*, 402 F.Supp. 1268, 1276–77 (E.D.Pa.1975), *appeal filed*, No. 75–2407 (3d Cir., filed Nov. 25, 1975). See *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 256 n.12 (S.Ct.1976).

However, *Berkebile I* was affirmed and is good precedent until the Pennsylvania Supreme Court gives us further guidance. It, as well as prior Supreme Court precedent, compel us to find that the trial Judge erred by not submitting the failure to warn question to the jury. We do so reluctantly, for obviously the law of Pennsylvania is very far from clear.

*Berkebile I*, aside, we think the Supreme Court's holding in *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971) supports our result. The full court in *Incollingo* adopted comments *h* and *j* to section 402A which provide that a product which requires adequate warning of danger involved in its use is defective if sold without such a warning. In *Incollingo*, the Supreme Court applied the warning requirement to a prescription drug. *Incollingo* was decided approximately four years before *Berkebile* and the Justices concurring and concurring-in-the-result in *Berkebile II* did not attempt to distinguish it or to limit the rule relating to warnings. Justice Pomeroy's concurring opinion specifically reaffirmed *Incollingo*, 462 Pa. at 104–105, 337 A.2d at 904. It therefore appears that the Pennsylvania law requires us to conclude that a product which contains inherent dangers, is defective when sold, if not accompanied by a sufficient warning to the consumer of possible risks and limitations of the product.[8] Indeed, in their brief and oral

---

8. *Incollingo's* holding with regard to the no-warning issue was supported by all the Justices participating. Its holding in this regard was cited with approval by the Pennsylvania Supreme Court in *Kuisis v. Baldwin-Lima-Hamil-* *ton Corp.*, 457 Pa. 321, 331–32, 319 A.2d 914, 921 n.14 (1974) (dictum). *See also Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 433–34, 307 A.2d 449, 458 (1973).

argument appellees do not take issue with the requirement of a warning under section 402A, but contend that Greiner did not present sufficient evidence to require jury submission of a no-warning defect charge.

It remains to examine the record to determine whether the 1966 VW colorably could be characterized as having "inherent dangers," so as to justify submitting the question of no-warning to the jury.

Greiner presented two expert witnesses who described the VW's design and handling characteristics. Each expressed the opinion that it was designed in a defective manner and was an unstable vehicle with a tendency to overturn. Both witnesses testified that the design defect was the cause of the overturn. The expert witnesses presented by the appellees testified to the contrary that it was a safe vehicle. The appellees contended that the overturn was due solely and completely to Mrs. Nickel's manner of operation and that it was in no way attributable to any characteristic of the car. Some of the appellant's experts' testimony should be presented here. O'Shea testified in part as follows on direct examination:

"Q. Now, Mr. O'Shea, as a result of your investigation in this case, your study, your analysis, your background in the study of the 1966 Volkswagen Type 1 sedan, do you or do you not have an opinion as to whether that vehicle as designed and sold was or was not stable insofar as its propensity to upset or overturn was concerned?

"A. Yes, I have an opinion.

"Q. What is your opinion?

"A. It was not stable in that connotation.

"Q. As a result of your investigation, study, analysis and operation of the 1966 VW Type 1 sedan, do you have an opinion as to whether the vehicle as designed and sold was or was not defective and dangerous from the standpoint of ability to upset or overturn?

"A. Yes, I have an opinion.

"MR. MADEIRA [counsel for VW]: I object to the form of the question.

"THE COURT: Overruled.

"By MR. BERNSTEIN [counsel for Greiner]:

"Q. What is your opinion, sir?

"A. My opinion is that it is defective and dangerous because it will allow this rollover to take place and it will get you into the situation . . . [where] the rollover tak[es] place.

"Q. Do you have an opinion as to whether such vehicle did or did not have a propensity to overturn?

"MR. MADEIRA: I object to the form of the question.

"THE COURT: Overruled.

"A. Yes, I have an opinion.

"Q. What is your opinion?

"A. It has a propensity to overturn." [9]

The testimony of the other expert offered by the appellant, Batterman, was to similar effect. The appellees offered countervailing testimony, including expert opinion, accident reconstruction, and film displaying the handling characteristics of the VW at speeds comparable to those at which it was estimated to have been driven on the night of the accident. Although the jury rejected the opinions of the Greiner experts on the issue of design defect, we find they were sufficient to form a basis for jury deliberation on whether there was liability for failure to adequately warn of inherent or latent limitations in a product, which do not necessarily amount to a design defect. Under Pennsylvania law we find this an

Any distinction between application of section 402A to drugs and to automobiles with a propensity to oversteer under Pennsylvania law has not been brought to our attention. Strict liability law generally in most jurisdictions has been progressively enlarged to cover all products. Comment, 14 *Duques.L.Rev.* 25, 45 (1975). Certainly the language of section 402A does not suggest such a distinction. However, the full import of the language "inherent limitation" is not apparent to us. We suspect this problem, as well as the possible irrelevance of warning to this split-second accident, troubled the trial Judge, as it does this Court.

**9.** Notes of Trial, pp. 718–19.

independent basis of liability, not requiring the jury to find a design defect.[10]

However, the failure to charge on no-warning defect would require a new trial only if, as a matter of law, there was sufficient evidence to go to the jury on the two other elements necessary for strict liability on this issue. Assuming *arguendo* there was defect, it must appear there was sufficient evidence to permit a jury to find that the defect was unreasonably dangerous and the proximate cause of the accident. Since these questions of evidentiary sufficiency have not been adequately briefed here, we remand for determinations by the District Court.[11]

Both of these issues should be submitted to a jury " 'where facts are disputed, or where from the undisputed facts there is room for reasonable differences of opinion . . .' " *Kridler v. Ford Motor Co.*, 422 F.2d 1182, 1185 (3d Cir. 1970), *quoting, Topelski v. Universal South Side Autos, Inc.*, 407 Pa. 339, 346–49, 180 A.2d 414, 417–19 (1962) (negligence action)[12]; *United States ex rel. Fear v. Rundle*, 506 F.2d 331, 338 (3d Cir. 1974) (dissenting opinion), *cert. denied*, 421 U.S. 1012, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975). There have been tort cases decided under Pennsylvania law where it has been found proper to remove proximate cause issues from the jury. *Schreffler v. Birds-*

---

**10.** We observe that appellees' counsel contend that the appellant's counsel acquiesced in the court's refusal to charge on the failure to warn. The following took place:

> "MR. BERNSTEIN [Counsel for Greiner]: In other words, it is the failure to warn that is the defect, and who knows what she would have done had she been alerted to this particular situation.
> "THE COURT: But if they find that there was a propensity to overturn and that it did overturn because of that and that . . . was a defect, why do you need the business about the warning?
> "MR. BERNSTEIN: Really, just an additional basis of liability.
> "THE COURT: I think it is a dangerous additional basis of liability.
> "MR. BERNSTEIN: Well, at this point I don't want any additional dangerous basis of liability.
> "THE COURT: I think it is, and I have been very troubled by the issue of warnings in this case, and I am going to refuse it.
> "MR. BERNSTEIN: O.K." Notes of Trial, pp. 10–122 to 10–123.

The use of the phrase "O.K." is deemed by appellees' counsel to constitute waiver. We choose to interpret the phrase as acknowledgment of the trial Judge's ruling.

Nor do we find persuasive appellees' contention that, since the appellant failed to produce competent evidence on what an adequate warning would be in the circumstances of this case, she was not entitled to a no-warning charge. The appellees cite us no Pennsylvania precedent holding that the appellant had the burden of showing the particulars of proper warning.

**11.** There was a motion for directed verdict by the defendants at the close of all the evidence, which the trial Judge denied orally, without written order, prior to consideration of the parties' suggested points for charge. Notes of

Trial, p. 10–96. It might be argued that determination of the sufficiency of the evidence on these two issues on remand would be unfair to Greiner. For, if her evidence is found wanting, she would not have the chance to cure.

The trial Judge can take this consideration into account in his sufficiency and new trial determination. On the basis of the briefing now available to us, it appears that counsel for Greiner should have known under any interpretation of Pennsylvania law that there had to be sufficient evidence to go to the jury on the issue of proximate cause. Further, counsel abandoned his objection on the unreasonable danger issue prior to the jury charge, *see* discussion under C. *infra*, and is likely to have known it was a requirement for liability, as well. Finally, it appears that the issue of defect for failure to warn was not out of the case as a basis of liability until the discussion of the points for charge at the conclusion of all the evidence. We are not aware of any action earlier in the trial by the Judge which would give Greiner a reasonable basis to believe this defect was out of the case. *See* Appellant's Br., p. 16. If subsequent briefing on remand uncovers other elements in this fairness equation, the Judge should take them into account at his discretion.

There was no written order filed denying the motion for directed verdict and no docket entry, Rule 79(a), FRCP; however, there was no objection and we can see no prejudice. Rule 61, FRCP.

**12.** While we find no precedent directly on point under Pennsylvania law, we assume the same factual test applies to both proximate cause and unreasonably dangerous issues.

Further, the same *Topelski* test, *supra*, has been applied in both strict liability and negligence contexts. *See, e. g.*, Schreffler, *supra*, 490 F.2d at 1154 (proximate cause).

*boro Corp.*, 490 F.2d 1148, 1154 (3d Cir. 1974) (rule applicable both in strict liability and in negligence). *Liney v. Chestnut Motors, Inc.*, 421 Pa. 26, 218 A.2d 336 (1966) (negligence action). But see *Capasso v. Minster Machine Co.*, 532 F.2d 952 (3d Cir., filed April 5, 1976); *Hanlon v. Cyril Bath Co.*, No. 75–1334 (3d Cir., filed Dec. 9, 1975).

On remand the District Court should consider, *inter alia*, what weight to attach to the jury's finding that Nickel's driving was negligent and a substantial factor causing the accident. Interrogatories to the Jury, Nos. 5, 6, *supra;* Appendix, *infra*, at 24–25, see *Schreffler, supra*, 490 F.2d at 1154. Generally the record should be surveyed to ascertain whether the jury would have been invited to indulge in "pure conjecture or guess", *Kridler, supra*, 422 F.2d at 1186, if charged on the unreasonably dangerous and proximate cause issues.

### C. The Charge on Unreasonably Dangerous

The appellant, relying once again heavily on *Berkebile II*, urges that the trial Judge erred when he charged the jury that they had to find the VW had a defect which was "unreasonably dangerous," as well. We cannot agree, for two reasons. We find that Greiner waived on this issue under Rule 51, FRCP; and, in the alternative, hold, that, even if there had been no waiver under the confused law of this case, Greiner does not have a meritorious argument. We feel compelled to include this latter finding to expedite a new trial, if the Judge finds one is necessary on remand.[13]

■ On the waiver issue, Greiner did before trial submit a proposed interrogatory suggesting that the jury merely had to find a defect "dangerous," not "unreasonably dangerous." And Greiner's counsel did file a suggested interrogatory at the end of trial with the latter language and, as far as we are able to ascertain, never took exception to the District Court's charge. The language of Rule 51 requires such exception. Under it, Greiner clearly waived.

*Bair, supra; Harkins v. Ford Motor Co.*, 437 F.2d 276, 278 (3d Cir. 1970).

■ On the merits, the Restatement literally applies to a product sold "in a defective condition unreasonably dangerous to the user or consumer." Comments *i* and *j* indicate that "unreasonably dangerous" is to be defined by asking the question whether the user or consumer ordinarily would know of the product's dangerous or unsafe propensities. See 14 *Duques.L.Rev., supra*, at 48–49.

Following *Berkebile II*, the appellant would have us hold that the phrase "unreasonably dangerous" is redundant with the words "defective condition." "To charge the jury or permit argument concerning the reasonableness of a consumer's or seller's actions and knowledge, even if merely to define 'defective condition' undermines the policy considerations that have led us to hold . . . that the manufacturer is effectively the guaranter [sic] of his product's safety." *Berkebile II, supra*, 462 Pa. at 97, 337 A.2d at 900. (citation omitted).

An alternative position, which we accept, is that the Pennsylvania Supreme Court in its adoption of section 402A and willingness to refer to its comments for guidance has never read the "unreasonably dangerous" language out of the section. As noted above, *Berkebile II* cannot be read as the majority view in Pennsylvania. See *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966); *Bair, supra; Eshbach v. W. T. Grant's Co.*, 481 F.2d 940, 942 (3d Cir. 1973); *Beron, supra*, 402 F.Supp. at 1273–76.

Judge Huyett in his well-reasoned opinion in *Beron* notes that even under *Berkebile II*'s ambiguous language a carefully-tailored charge on the meaning of unreasonably dangerous might be permissible. *Id.* at 1273. The trial Judge's charge, Appendix, *infra*, at 31, is carefully drawn to respect comments *i* and *j* and could be construed as proper under *Berkebile II*.

However, even if *Berkebile II* is inconsistent with the Judge's charge on this

---

**13.** We note that the trial Judge's difficulty in comprehending how a warning may have prevented this accident may be relevant in this context. *See* "Facts" and n. 8, 10, *supra*.

point, its weak precedential value does not permit us to find an "unequivocal rejection" of the unreasonably dangerous concept in Pennsylvania. *Bair, supra; Beron, supra,* 402 F.Supp. at 1273. This is especially true given the phrase's important place as a limitation on liability in the American Law Institute's deliberations when it drafted section 402A. 14 *Duques.L.Rev., supra,* at 46.

### D. *The Charge on Normal Use*

██ Greiner also objects to the trial Judge's submission to the jury of the question whether the VW was in "normal use" at the time of the accident. In the alternative, she would have us hold that the charge, if permissible, was misleading. Although the words "normal use" do not appear in the text of section 402A, they do appear in comment *h,* which says that a product is not defective when it is safe for normal handling.

Insofar as we can divine Pennsylvania law, we cannot perceive that the Judge erred in his charge on normal use.

### 1. The Permissibility of Any Jury Charge

In *Bartkewich v. Billinger,* 432 Pa. 351, 247 A.2d 603 (1968), the Pennsylvania Supreme Court reversed a denial of judgment n.o.v. in a strict liability case. The legal issue was whether a glass-cutting machine had a defect during normal use. Apparently as a matter of law, the court indicated that the manufacturer could not be liable for an accident where the worker voluntarily did not use the machine "in its usual manner." 432 Pa. at 356, 247 A.2d at 606. While not focusing explicitly on the question whether the jury should decide the question of normal use, this holding implies that normal use is solely a question of law within the bench's bailiwick. However, subsequent Pennsylvania and federal precedent, more to the point, leads us to the opposite conclusion.

*Berkebile I* did not expressly address the issue of the appropriateness of jury determination of normal use. However, it did not quarrel with the trial Judge's charge, which allowed the jury to make at least one factual determination with respect to normal use.[14]

This reading of *Berkebile I* is consistent with past interpretations of Pennsylvania law by the federal courts. In affirming a District Court judgment, this Circuit has noted "[w]e . . . think that there was ample evidence for the jury to find that the [product] was not abnormally used." *Greco v. Bucciconi Engineering Co.,* 407 F.2d 87, 91 (3d Cir. 1969). In *Eshbach, supra,* 481 F.2d at 943, the trial Judge's charge was found improper because it reverted to negligence concepts. In noting the correct charge, the Court said, "the proper limits of responsibility for the defendant-seller here is whether the 'use' to which the product was put was intended or foreseeable (objectively reasonable) by the defendant." (citation omitted). The nature of this suggested language, as well as the Court's failure to question the appropriateness of any charge

---

**14.** The Judge charged: " '[i]f you push [the helicopter's] collective lever down and go into autorotation within the necessary time, then you are using it normally, but if you do not do it then you are not using it normally.' " 462 Pa. at 98, 337 A.2d at 900. " ' . . . There is testimony that in this helicopter the pilot would have one second, less than a second or more than a second, depending on which witness you believe. This leads to the question that you must decide, that is, was any of these times sufficient to allow Mr. Berkebile to get into autorotation.' " 225 Pa.Super. at 353, 311 A.2d at 142. *But see* Justice Roberts concurring, 462 Pa. at 104, 337 A.2d at 903–04.

The Jones-Nix treatment of the normal use issue in *Berkebile II* is of uncertain application here. That opinion characterizes the trial Judge's charge as improperly tantamount to directing a verdict as a matter of law. It implies that the jury improperly had no effective role in determining normal use. However, it goes on to argue that the jury should *not* be charged that a finding of abnormal use is a defense to liability. The jury could be instructed as to the employment of abnormal use evidence to rebut plaintiff's defect and proximate cause arguments. The implication of this defense/rebuttal line for the case at bar eludes us. Given the weak precedential position of *Berkebile II, see* discussion *supra,* we decline applying it to the trial Judge's charge.

on this matter, imply that the jury should be charged on this issue.

In *LaGorga v. Kroger Co.*, 275 F.Supp. 373, 379–80 (W.D.Pa.1967), *aff'd on other grds.*, 407 F.2d 671 (3d Cir. 1969), the trial Judge stated: "[i]n our opinion the evidence posed . . . important issues of fact for the determination of the jury since they were such that reasonable men could differ. Among these, the jury found . . . (3) that the [product] was not reasonably safe for normal wear by a young child; and (4) that it was foreseeable [by the manufacturer] that such a child might play with or around fire and such was not abnormal wear of the jacket." (citation omitted).

Greiner relies on *Dyson v. General Motors Corp.*, 298 F.Supp. 1064, 1070–73 (E.D.Pa. 1969) (Fullam, J.). However in that case the trial Judge refused to grant judgment on the pleadings, and find *inter alia*, abnormal use, as a matter of law. He did not address who should make the abnormal use determination once the case went to trial.

On the basis of this precedent, we hold that the trial Judge here properly charged the jury with deciding the normal use question.

### 2. The Content of the Jury Charge

Having decided that a jury charge on the issue of normal use was appropriate, we must ascertain whether the content of the charge was proper. Greiner contends that the Judge confused normal use with the manner of handling the VW at the time of the accident, allowing the jury to find abnormal use and no defect if the auto was mishandled, or negligently handled, by Nickel. Greiner contends that, under the correct rule, the manner of use is irrelevant. The jury should have been instructed that, if the VW was being used for transport along the highway at the time, that would be sufficient to find the normal use predicate of defect. Greiner fails to cite any case in support of this precise contention.

Even if this were the law, we find that the charge gave Greiner in essence what she wanted. The Judge instructed the jury that they could find normal use, even if Nickel was mishandling the VW. In the Judge's words "normal misuse" would be sufficient to support a finding of defect. See Appendix, *infra*, at 23. His instruction is in keeping with Pennsylvania position "in the forefront" of liberal construction of the words of section 402A, *Dyson, supra*, 298 F.Supp. at 1070. We affirm with regard to this issue.[15] An appendix to this opinion contains the charge of the Court.

### E. Conclusion

We find that the trial Judge acted properly with regard to the admission of the evidence of Nickel's drinking, the charge on the "unreasonably dangerous" wording of section 402A, and the charge on "normal use." However, we must reluctantly remand for determinations by the Judge, *as a matter of law,* as to whether or not there was sufficient evidence for the jury to find,

---

**15.** The language of the *Berkebile* charge, extracted *supra* at note 14, may present problems for this analysis. The key words are "within the necessary time" and "sufficient" time. Conceivably sufficient time could encompass the time required in "normal misuse" and the *Berkebile* charge arguably is consistent with the Judge's charge. Abnormal use would occur when the helicopter pilot failed to go into auto-rotation after the time the manufacturer would contemplate in the "normal misuse" case. The pilot failure would be so gross so as to go beyond the liberal normal misuse standard. In our case it would be tantamount to Nickel driving through a field, rather than on a highway, at the time of the accident. *See* Dyson, *supra*, 298 F.Supp. at 1072–73.

It is also possible to construe the *Berkebile* charge as strictly narrowing the manufacturer's contemplation of normal use, so as to make a finding of strict liability much more difficult. *See Berkebile II, supra*, 462 Pa. at 96–101, 337 A.2d at 900–01. However, the majority opinion in *Berkebile I*, the only opinion we find has substantial precedential value in the case, does not clearly address the particular normal use aspect of the charge. 225 Pa.Super. at 352–53, 311 A.2d at 142. We are reluctant to interpret its affirmance of the charge in general as approval of a restrictive normal use formulation, because Pennsylvania courts have tended to give liberal construction to the provisions of section 402A to enhance, rather than retard, its reach. *See Dyson, supra*, 298 F.Supp. at 1070.

if charged, that the lack of warning *was unreasonably dangerous* and the proximate cause of the accident. If there was sufficient evidence, then Greiner is entitled to a new trial. Defect for failure to warn is an independent basis of liability under current Pennsylvania law. If the evidence is otherwise sufficient, the Judge's refusal to charge on this issue affected a substantial interest of Greiner and, therefore, a new trial should be granted.

Because of the necessity to dispose of the issue raised under this heading and under "B", *supra,* we will vacate the judgment and remand for further consideration and determination by the District Court of that issue. If it be resolved in the defendants' favor, the learned trial Judge shall reinstate the judgment.

## APPENDIX

### CHARGE TO JURY

### (EMPHASIS SUPPLIED)

"[Reading of Interrogatories, *supra* ]. [L]et me read to you this section of the Restatement on which this action is based.

" 'One who sells any product in a defective condition, unreasonably dangerous to the user or consumer—and I charge you in this connection that Thelma Greiner, although she did not buy the Volkswagen, is a user within the meaning of this section— is subject to liability for physical harm thereby caused to the ultimate user or consumer—and by "thereby" they refer to the dangerous, defective condition—if, A, the seller is engaged in the business of selling such products—and that is conceded here, that Volkswagen is—and, B, it is expected to and does reach the user or consumer without substantial change in the condition in which it. is sold—and this applies, this rule—although the seller has exercised all possible care in the preparation and sale of his product . . .

. . . . .

"What you have to decide here is, was this Volkswagen defective in a way as to create an unreasonable danger to the persons who could be expected to use it.

"When we speak of 'defect,' we do not necessarily mean only a mechanical defect. We do not necessarily mean some defect in the materials that break or something of that sort. *We are speaking here of a defect in design* which the plaintiff contends made this automobile unreasonably subject to rolling over under normal conditions or normal use.

"Now, this latter part of it is something that is very important, speaking of '*normal use.*'

"I am going to let you determine whether what happened on the night of this accident is such as it should be considered a part of the normal use of an automobile. It has been suggested to you that driving an automobile over a plowed field is not a normal use, and I think that is true.

"What you have heard in this case, as I see it, is an automobile that is driving along the highway, and certainly that is a normal use, that is what an automobile is intended for, to drive on the highway.

"There arises a situation as a result of which the driver engages in certain emergency or evasive maneuvers.

"Considering driving today, considering road conditions today, considering traffic conditions today, considering the time of day that it was, namely, dark, was it a part of the normal use of an automobile to drive it at whatever rate of speed you find it was being driven, perhaps to go over the center line in going around a curve, to go back onto the other side or right side of the road, and then attempt to avoid an obstacle, and was it part of the normal use of an automobile to engage in the maneuvers that Mrs. Nickel engaged in, whatever you find they were.

"You may find exceeding the speed limit, going over the center line, if she did those things, is a misuse of the automobile, but I don't think that ends your inquiry. Is that a *normal misuse* of an automobile? Do people normally misuse automobiles in that way? If not, then you would say that is not a normal use, but if they do, if that is a

normal way for some, maybe not all, maybe there are those who would never do that, maybe there are those and a sufficient number of them and sufficiently often that you would say that was a normal use of the vehicle.

"If you conclude that that was a normal use of the automobile or if you will a normal misuse of the vehicle, then you would have to ask yourself, 'Was this automobile defective in that it created an unreasonable harm or a risk of unreasonable harm under normal operating, using conditions?' If it did, then, you would answer the first question 'Yes.' If you find to the contrary, then you would answer that question 'No.'

"An automobile manufacturer is not under a duty to furnish a vehicle that is accident-proof. Nor is the motor vehicle manufacturer bound to take into consideration abnormal use such as I have described, driving over a plowed field, but the manufacturer is obliged to take into consideration normal use or indeed normal misuse, if you find that that existed, and if you find that this was normal use or, as I have said, normal misuse, and if you find that operating under those conditions, under conditions of normal use, the motor vehicle malfunctioned, that is overturned, because that certainly is a malfunction, we expect automobiles to stay upright, then you would from that be entitled to find that there was a defective condition such as I have described.

"*Of course, I think you have to consider the purpose, the nature of the car, different models, all of these things in determining whether that was a defective automobile in the sense that it was defective in design.*

"The mere fact that one car may handle differently from another does not necessarily make it defective. *The central point as I see it is whether in the intended, forseeable use of this vehicle it overturned when it shouldn't have and if in your judgment that constitutes a defect.*

"Going beyond that, you would also have to find that the defect was a substantial cause of the accident or a substantial factor in bringing about the accident. Was it the *proximate cause* of the accident?

"Now, there can be any number of substantial factors. I will come in a moment to any possible finding of negligence on the part of Judith Nickel.

"She may have been negligent and you may so find. I would be surprised indeed if you didn't, but that is only my opinion, and your opinion is what governs.

"You may find that she was negligent, but mere negligence alone does not constitute an unforeseeable misuse of the car, an unforeseeable misuse of the car mind you or an abnormal misuse of the car because you may find that negligent driving in the sense of wandering over the center line or exceeding the speed limit is so normal, although the law may call it negligent, that you might find that is so normal that any manufacturer should anticipate that and the maneuvers which might be necessary to correct it.

"But, I started to say, it may be that Judith Nickel's negligence, if you find it, was a substantial factor in bringing about this accident. This would not prevent a defect in the design from also being a substantial factor. There may be a defect which exists passively and which is harmless until it is brought into being by some other external operating force.

"On the other hand, if you find that there was a defect but that it was not a substantial factor in bringing about the accident, then your answer to Questions 2 and 3 should be 'No.' If you find that it was, then your answer should be 'Yes.'

"The defense here, as I see it, and I am subject to correction, but the defense here is that this is not a dangerously or defectively-designed vehicle. That, on the contrary, it is a well-designed vehicle, and you heard the experts' testimony as to that. You heard all of their mathematics, and there is no conceivable way in the world that I could sum up that for you, no way, but you heard it.

"The defense is that there was no defect, this is a properly-designed vehicle in every respect, and that this accident was caused

by tripping, this was Mr. Severy's theory, by striking the curb.

"If you find that, then whether you find a defect or not, if that was the cause of the accident, then the defect was not a substantial factor in bringing about the accident or, to put it differently, striking the curbing you could find, if that is what happened, and you will remember the sharp difference on cross-examination as between Mr. Bernstein and Mr. Severy, if you find that that was what happened, I think you would be entitled to find that that is not normal handling of the vehicle; namely, striking a curb. If that is what it was, then you could also find that there was no defect in design. This is the defense.

"It really comes down to the fact I think that if you find that the tripping, by striking a curb, if it did, if you find that that is what caused the car to roll over, then you could properly find there was no defect in design or that any defect was not a substantial factor in bringing it about.

"Here I think is where you should bring into play a principle that I gave you at the outset, and that is that opinion evidence is of a lower quality and lower form than fact evidence.

"My recollection of the testimony of all the witnesses who were there was that the car did not strike anything before it rolled over, with the exception of Mr. Cunningham, and Mr. Cunningham as a witness deserves some special kind of consideration. You have heard the testimony on that. It is a sad note that his son came in here and testified to his father's mental infirmities. I am sure it was difficult for him. Nonetheless, if you find that those infirmities were such as to weaken or destroy his credibility, you would be entitled to come to that conclusion.

"Now, as I remember it, his testimony was the only testimony bearing on any striking, with the exception of that of Mr. Severy, who was not there, but you are entitled to accept that, you are entitled to accept the testimony of Mr. Cunningham.

I have not said that he was incompetent, but certainly his credibility is for you.

"We come to Judith Nickel. You are asked to find whether Judith Nickel was negligent. Negligence has been defined in various ways. It has been defined as the doing of that which an ordinarily reasonably prudent person would not do under the circumstances or the failure to do that which a normal, reasonably prudent person would do under the circumstances. What it means really is the failure to exercise reasonable care under all of the circumstances.

"Going to the wrong side of the road is prima facie evidence of negligence. You will have to determine whether under the circumstances Miss Nickel was driving too fast for conditions, and indeed there has been evidence here that she pleaded guilty to such a charge, and that is evidence that she was in fact driving too fast for conditions.

"There is also evidence here from Trooper Koper that Miss Nickel, Mrs. Nickel said to him that she had had two drinks, I think. I think that is what she said.

"I suppose that you would be entitled to consider whether that impaired her driving ability to such an extent that she was negligent. As I see it, it would only go to the question of whether she was negligent. She was not charged as far as I know with drunken driving, certainly didn't plead guilty to anything like that, no evidence of any conviction of that, and I don't mean to imply that any of you are drinkers, it is the farthest thing from my mind to suggest that, but if you are by any chance, I think you would be entitled to call on your own experience as to what the effect of two drinks is, and I don't think we know where she had them, but what the effect of that would be, if any. In all events, it is a factor for you to consider in determining whether Judith Nickel was negligent.

"Remember, as I have said, the mere fact of negligence does not constitute abnormal handling. It may constitute normal misuse because whether any of you are drinkers or not, we know that there are many, many,

many people constantly who will drive a car having had two drinks. So that while you may find Judith Nickel negligent and may find that her negligence was a substantial factor in bringing about the accident, this does not necessarily mean that you should find that any defect, design defect, if you find one, was not a substantial factor also in bringing about the accident. All of these things are matters for you to consider.

"Your verdict in this case should be reached without any consideration of the fact that Thelma Greiner is an individual who has been grievously injured. We know that. Nor should you consider the fact that the defendant, Volkswagen, and Volkswagen of America are corporations. Thank heaven, under our law, corporations, individuals, black, white, Catholic, Protestant, Jew, stand equal. They are entitled to be judged on the basis of the evidence and on the basis of the evidence alone. Not sympathy, not bias, not prejudice. Your verdict must be unanimous.

"Are there any exceptions?

(The following took place at side-bar:)

"MR. BERNSTEIN: I would except to Your Honor's charge with regard to the negligence of Judith Nickel, in stating that you would find her negligent but that it was up to them.

"THE COURT: I grant you an exception.

I grant you an exception to this too, Mr. Ryan.

"MR. RYAN: Yes, sir.

"MR. BERNSTEIN: I would ask Your Honor to charge, and I did not hear it in the charge, I believe it is in my points, that *normal use* is not the same as safe use. You said normal use can be normal misuse, but it should be differentiated.

"Your Honor said he was going to charge on my Point No. 2, that we are not required to prove that they were negligent or careless.

"THE COURT: I covered that.

"MR. RYAN: That I think you did.

"MR. BERNSTEIN: Well, I don't know that you covered it directly, but I would ask Your Honor to charge about normal use not being the same as safe use.

"THE COURT: No. I think I have said enough on that. I will grant you an exception.

"MR. BERNSTEIN: All right.

"THE COURT: I think I have covered that adequately.

"MR. BERNSTEIN: I did not hear Your Honor define 'substantial factor.' You told them that there can be more than one substantial factor, but what a substantial factor is. It need not be 50 percent or 30 percent. It must be more than something, just incidental to the happening of the accident.

"THE COURT: All right.

"MR. BERNSTEIN: I did not hear Your Honor define the term '*unreasonably dangerous*' as set forth in my Point No. 3.

"THE COURT: I think you are right on that. I don't think I did.

"MR. BERNSTEIN: That would be my Point No. 3, Your Honor.

"And in accordance with my Points 6 and 7, although Your Honor did talk about normal misuse, I did not think that Your Honor charged that emergency maneuvers come within—

"THE COURT: I am sure I did.

"MR. BERNSTEIN: Might I have an exception to that?

"THE COURT: Yes.

"MR. BERNSTEIN: I didn't catch it.

Finally, I don't think that Your Honor covered my Point 13 [extent of manufacturer's foreseeability of use].

"THE COURT: I think I have covered that adequately.

"MR. BERNSTEIN: You will grant me an exception to that?

"THE COURT: Yes.

"MR. MADEIRA: Do I understand that Your Honor is going to explain the defini-

tion of the term 'defective' and 'unreasonably dangerous'?

"THE COURT: Well, I think I have defined the term 'defective.' I will define 'unreasonably dangerous.'

"MR. MADEIRA: O.K. Other than my difference as expressed on the record last Friday afternoon with Your Honor, I have no exceptions.

.    .    .    .    .

"The other point is that on Question No. 6 in the interrogatories [supra] I don't believe you made it clear that there is a proximate cause question—

"THE COURT: I think I did.

"MR. RYAN: —as to us. I think you did in the context that their defect may not be a substantial factor, but I don't believe it is clear that her negligence might not be, if the defect—

"THE COURT: All right.

"MR. MADEIRA: I think you did cover it.

"THE COURT: I thought I did too.

"MR. BERNSTEIN: I didn't think that you did.

(End of discussion at side-bar.)

"THE COURT: I have been asked by counsel to make some additions.

"I have been asked to charge you that normal use is not the same as safe use. Well, I think I have already said that. That there can be negligent use, but that negligent use, if that is unsafe, can still be a normal use which should be anticipated.

"I did not define, I think, substantial factor, and, of course, what we mean by that is the ordinary common sense meaning that it is not just a little something hanging around on the periphery of the event. It is a substantial contributing cause, that it is not just incidental to the happening of the accident, and this would also go for any negligence on the part of Miss Nickel. If you find that there was negligence on her part but that it was merely incidental to the happening of the accident and was not a substantial cause, then you should answer that question 'No.' If you find that it was, then you should answer it 'Yes.'

"I think I did not define what I mean by 'unreasonably dangerous,' and that means, 'unreasonably dangerous' means that the automobile must be dangerous to an extent and in a manner beyond that which is contemplated and expected by the ordinary user, and as I have already defined in this case Miss Greiner is a user within the meaning of that.

"The only other thing that I would charge you is that while we are asking you to find whether or not Miss Nickel was negligent, we are not asking you to find whether Volkswagen was negligent.

"I have defined negligence to you as being the failure to exercise reasonable care. The liability of Volkswagen, if it exists, is not dependent on the exercise of reasonable care. If Volkswagen took all precautions but there was still a defect in design, they are absolutely liable, without regard to any notions or ideas of negligence.

"Does that cover your points?

"MR. BERNSTEIN: Yes, Your Honor.

"THE COURT: Mr. Madeira?

"MR. MADEIRA: Yes, sir.

"THE COURT: No further exceptions?

"MR. MADEIRA: No, sir.

"THE COURT: Mr. Ryan?

"MR. RYAN: Yes, sir.

"THE COURT: Very well.

"As I said, members of the jury, your verdict must be unanimous. All right."